1 F.3d 1249
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Floyd F. NEYMAN, Plaintiff-Appellee,
v.
UNITED TELECOMMUNICATIONS, INC.; United Telephone System,
Inc., Defendant,
and
United Telephone Company of Kansas, Defendant-Appellant.
 Nos. 92-3173, 92-3221.
 United States Court of Appeals, Tenth Circuit.
 July 19, 1993.
 
 1
 Before LOGAN and KELLY, Circuit Judges, and ALLEY, District Judge*.
 
 
 2
 ORDER AND JUDGMENT**
 
 
 3
 WAYNE E. ALLEY, District Judge.
 
 
 4
 Defendant United Telephone Company of Kansas ("UTC") appeals from judgment entered following a jury verdict in favor of plaintiff Floyd F. Neyman in his action brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Sec. 621 et seq. The jury found both retaliation and wilful violation of the ADEA. Mr. Neyman was awarded actual damages in the amount of $125,000 and liquidated damages. UTC appeals from the district court's denial of its motion for judgment notwithstanding the verdict, or in the alternative, for new trial. UTC appeals, arguing that Mr. Neyman did not produce sufficient evidence to meet his burden of proof in three respects: (1) to support a verdict for retaliation under ADEA, (2) to uphold the jury's finding of wilfulness and (3) to sustain the actual damages award of $125,000. For the reasons that follow, we affirm.
 
 I.
 Background
 
 5
 In 1964, Mr. Neyman was hired by UTC as a management trainee. After completing his training, he began his career with UTC as the Assistant District Manager in Russell, Kansas. Mr. Neyman spent the next twenty years ascending the ranks at UTC.[1] In 1984, after expressing a desire to attain a vice president-level position in the company, Mr. Neyman was told he needed corporate staff experience. The Vice President of Operations for UTC arranged for him to have an opportunity to work in a staff position at United Telephone System, Inc.[2] Mr. Neyman took a corporate staff position with the engineering operations group as Manager of Operating Systems and he held that position for two years.
 
 
 6
 Following a special assignment with an affiliated company, Mr. Neyman became acting Director of the Human Resources-Organization Development in early 1986. While serving this role for UTC, Mr. Neyman observed a pattern of UTC's hiring younger non-protected employees at mid-management positions with higher salaries and rapidly promoting them over long-time protected employees to upper level management. Mr. Neyman felt he was a victim of age discrimination, and communicated these concerns to UTC' Assistant Vice President of Human Resources. This action was followed by his filing an in-house age discrimination complaint in September of 1986.
 
 
 7
 Mr. Neyman held the acting director's position for nine months, until being assigned to the customer service department as Manager of Methods and Procedures. On February 9, 1987, Mr. Neyman filed a formal age discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). In January of 1988, UTC eliminated the position of Manager of Methods and Procedures; Mr. Neyman was left with the option of leaving the company or taking a lower-level position within his supervisor's department. He chose to stay, being demoted two levels to Business Office Administrator. After this demotion, Mr. Neyman filed an EEOC retaliation charge in August of 1988. Mr. Neyman never received a salary increase, promotion or any enhanced employment benefit after filing his EEOC charges.[3]
 
 
 8
 Mr. Neyman chaired numerous task forces and groups throughout his twenty-two year career with UTC, one of which developed the appraisal procedure used by UTC to evaluate its employees' job performance. Specific goals and objectives are listed from which the employee receives a numerical rating of employment achievement. Five, meaning "unsatisfactory" performance, is the worse rating that can be given; one, meaning "distinguished" performance, is the best. Two is considered "commendable," three "proficient" and four "marginal." Mr. Neyman was always rated as proficient or better, and had numerous commendable ratings until he filed his age discrimination charge with the EEOC in February of 1987.
 
 
 9
 Sue Wade was Mr. Neyman's supervisor for the last three months of 1986 and the first nine months of 1987. Karen Krepps replaced Ms. Wade as Mr. Neyman's supervisor for the final quarter of 1987, and gave him his overall evaluation for 1987. Both Ms. Wade and Ms. Krepps were aware of Mr. Neyman's EEOC age discrimination charge prior to their appraisals, and admit to having discussed it between themselves. In August of 1987, Ms. Wade told Ms. Krepps that Mr. Neyman was having problems in his position, and that she viewed his performance as a "4" or lower.
 
 
 10
 At the conclusion of 1987, Ms. Krepps formally rated Mr. Neyman's performance in the Manager of Methods and Procedures position at 3.58 for the year. This was rounded down to a four, a rating of "marginal," which means: "[h]as fulfilled some job accountabilities or work objectives, but has not completely or consistently achieved expected results." Mr. Neyman disputed this evaluation rating, but continued to work. He began his new position as Business Office Administrator in February of 1988, and he received below average performance evaluations until he resigned from the company in January of 1990.
 
 
 11
 The jury awarded Mr. Neyman $125,000 in actual damages based on three theories of recovery: breach of contract, age discrimination and retaliatory demotion. The jury also found UTC's ADEA violation to be wilful; therefore, the actual damages award was doubled to $250,000. UTC's motion for judgment notwithstanding the verdict, or in the alternative, for new trial was denied, and this appeal followed.
 
 II.
 Standard of Review
 
 12
 We review a grant or denial of a motion for judgment notwithstanding the verdict or new trial de novo, applying the same standard as did the trial court. Rajala v. Allied Corp., 919 F.2d 610, 615 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). Error can only be found when evidence is susceptible to no reasonable inferences sustaining the position of the party against whom the motion is made. EEOC v. Prudential Federal Savings & Loan Ass'n, 763 F.2d 1166, 1171 (10th Cir.1985), cert. denied, 474 U.S. 946 (1985). The reviewing court must affirm if evidence was before the jury upon which it could properly find against the movant. Hurd v. American Hoist & Derrick Co., 734 F.2d 495, 499 (10th Cir.1984). The appropriate inquiry under this standard is whether the evidence is sufficient for a reasonable jury properly to find a verdict in favor of the party against whom the motion is directed. Id. at 498-99.
 
 III.
 Claim For Retaliation
 
 13
 An employer is prohibited from retaliating against an employee because of the employee's opposition to an unlawful employment practice. Archuleta v. Colorado Dept. of Inst., Div. of Youth Services, 936 F.2d 483, 486 (10th Cir.1991). We apply the general approach for dealing with circumstantial evidence of disparate treatment cases adopted by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to retaliation claims under the ADEA. Anderson v. Phillips Petroleum Co., 861 F.2d 631, 634 (10th Cir.1988) (citing Lujan v. Walters, 813 F.2d 1051 (10th Cir.1987)). In order to establish a prima facia case of retaliation, a plaintiff must show that: 1) he engaged in protected opposition to discrimination; 2) adverse action by the employer followed the protected activity; and 3) a causal connection between the employee's activity and the adverse action occurred. Archuleta, 936 F.2d at 486 (citing Allen v. Denver Public School Bd., 928 F.2d 978 (10th Cir.1991)). Once the plaintiff has established a prima facia case, the burden of production shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for the adverse action. Anderson, 861 F.2d at 634 (citing Burrus v. United Telephone Co. of Kansas, Inc., 683 F.2d 339 (10th Cir.1982), cert. denied, 459 U.S. 1071 (1982)). Once the defendant has dispelled the inference of retaliation by establishing a legitimate reason, "the plaintiff may still prevail if [he] demonstrates the articulated reason was a mere pretext for discrimination." Id.
 
 
 14
 UTC challenges the jury's verdict that it retaliated against Mr. Neyman for voicing his age discrimination charges, arguing that there was no causal connection between Mr. Neyman's protected activity and the adverse treatment. UTC contends that there is no evidence of record to rebut the legitimate, nondiscriminatory reason for the adverse action, which was his supervisor's assessment that he failed to meet his employment objectives.
 
 
 15
 Evidence of retaliation in this case was strong; reasonable inferences flowing from the evidence were sufficient to support Mr. Neyman's claim. Mr. Neyman's evidence showed that he engaged in protected activity under the ADEA by filing his internal age discrimination claim with UTC's personnel office and his formal EEOC charge and that his supervisors took adverse action subsequent to the charge, demoting him two levels to the position of Business Office Administrator. UTC's dispute with the retaliation verdict centers upon whether the supervisor's lowered performance evaluations and subsequent demotions were causally connected to his participation in protected activity. We find that the evidence viewed as a whole is sufficient to establish that retaliation occurred after and because Mr. Neyman filed his age discrimination charges.
 
 
 16
 The following events support the view that Mr. Neyman's supervisors at UTC were attempting to disguise their discriminatory conduct by altering his performance evaluations. For the first nine months of 1986, Mr. Neyman held the position of acting director of Human Resources and his supervisor was Lon Oberkrom. Mr. Neyman was evaluated at the "2" or commendable level; however, for the last three months of 1986, when he held the position of Manager of Methods and Procedures and his new supervisor was Sue Wade, he was rated as a "3" or proficient. Sue Wade's appraisal was the first evaluation generated after Mr. Neyman filed his in-house age discrimination complaint.
 
 
 17
 Mr. Neyman objected to the rating, and testified that based on his human resources experiences, the proper procedure would have been to average the two supervisor's ratings to get an overall evaluation for the year. Support for the use of an averaging system was corroborated by other human resources personnel at UTC. Ms. Wade refused to do this. If this procedure had been used, Mr. Neyman would have been rated as a "2" or commendable.
 
 
 18
 Ms. Wade continued to act as Mr. Neyman's supervisor for the first eight or nine months of 1987 and Ms. Krepps held the position for the final quarter of the year. Mr. Neyman held the position of Manager of Methods and Procedures for that entire year, so the 1987 appraisal was the first rating made after he filed of his formal EEOC age discrimination charge. Mr. Neyman's rating plummeted to a "4" or marginal; he had never received a marginal rating in his entire twenty-two year tenure with the company. A month later he was demoted.
 
 
 19
 An employer's discriminatory conduct in a retaliation setting may be inferred from circumstantial evidence, including attempts to build a record and disguise discriminatory purpose. The Court finds that the jury could have reasonably interpreted the evidence presented at trial to indicate that Mr. Neyman's 1987 appraisal, a sharp break from his successful past, was an attempt to retaliate against him for filing his EEOC age discrimination charge. Since error can only be found when evidence is susceptible to no reasonable inferences sustaining the position of the party against whom the motion is made, the jury's verdict must stand. See Prudential, 763 F.2d at 1171, cert. denied, 474 U.S. at 946. The district court's judgment must be affirmed.
 
 IV.
 Finding of Wilfulness
 
 20
 UTC also contends that there was insufficient evidence from which the jury could have inferred that UTC's violation of the ADEA was wilful. A prevailing ADEA plaintiff is entitled to liquidated damages "only in cases of [wilful] violations." 29 U.S.C. Sec. 626(b).[4] The United States Supreme Court has ruled that a violation of the ADEA is wilful if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Thurston, 469 U.S. at 128 (internal quotation marks omitted); accord Hazen Paper Co. v. Biggins, --- U.S. ----, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); Anderson, 861 F.2d at 635; Archambault v. United Computing Systems, Inc., 786 F.2d 1507, 1513 (11th Cir.1986); see also 29 U.S.C. Sec. 626(b). The jury instructions were consistent with this definition, and nothing in the record suggests that the charge was disregarded.
 
 
 21
 The record reveals evidence which suggests that in demoting Mr. Neyman, UTC showed reckless disregard for the provisions of the ADEA. Chief among this evidence is the testimony of Ms. Wade regarding her conversation with Ms. Krepps in October of 1987. Ms. Wade admitted that both supervisors had knowledge of Mr. Neyman's EEOC filing, and that Ms. Krepps had indicated that she was going to take negative action. Ms. Krepps later testified that she based her negative evaluation on appraisals that she received in the field four months later. This inconsistency indicated that UTC's actions were "done voluntarily, deliberately and intentionally and not by accident, inadvertence or ordinary negligence." (Jury Inst. # 15).
 
 
 22
 After reviewing the record in the light most favorable to UTC, we conclude that there was evidence from which fair-minded jurors, exercising impartial judgment, could reasonably conclude that UTC engaged in a pretextual scheme to demote Mr. Neyman, and that his supervisors at UTC knew that this scheme was unlawful, or showed reckless disregard for whether these actions were prohibited by the ADEA. See Hurd, 734 F.2d at 499 (a reviewing court must affirm if evidence was before the jury upon which it could properly find against the movant). Therefore, the district court's denial of UTC's motion for judgment notwithstanding the verdict, or new trial with respect to the jury's finding of wilfulness is affirmed.
 
 V.
 Actual Damages Award of $125,000
 
 23
 UTC challenges the adequacy of the evidence that supports the actual damages award of $125,000 based on Mr. Neyman's age discrimination and retaliatory demotion claims. UTC contends that since Mr. Neyman's demotion did not result in a salary decrease, and only a salary freeze, he has not met his burden of placing evidence in the record affording reasonable support for the amount awarded. Mr. Neyman defends the jury's finding by citing evidence in the record that suggests a total of $496,000 in alleged losses caused by UTC's actions.
 
 
 24
 The law is clear that an ADEA claimant is entitled to be made whole for the losses sustained as a result of a wrongful termination. See Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975). This sum includes back pay from the date of discharge to the present, including increases, as the claimant would have received within that period. See Golay & Co. v. NLRB, 447 F.2d 290, 294-95 (7th Cir.1971), cert. denied, 404 U.S. 1058 (1972).[5]
 
 
 25
 Mr. Neyman's damage presentation was extensive, and consisted of several categories of losses suffered as a result of UTC's actions.[6] The jury's charge did not include an instruction to itemize the damage award; however, UTC never objected to the format of the charge or proposed an alternative format that would have provided the specificity that they now claim was needed in order to support the award rendered.[7]
 
 
 26
 The thrust of UTC's defense at trial was on liability, and only minor challenges were made to Mr. Neyman's damage calculation. The following exchange took place when UTC's counsel was examining Mr. Neyman on the issue of damage: "Now, turning to your damage--well, I don't think we need to examine it. I'll just ask you a couple of questions about your method of calculation on some of your damage figures, and maybe all of them if I heard you correctly." Tr. 337. UTC made a cursory investigation into Mr. Neyman's damage presentation, attempting to clarify the items and amounts of losses that he was claiming. Few or no direct challenges to the items and amounts of damages listed were made.[8]
 
 
 27
 In the absence of persuasive challenges to Mr. Neyman's damage computation, the jury was left to draw its own inferences.[9] The jury herein had ample information to draw from in totaling their award, and they obviously made an independent and contemplative damage calculation since approximately seventy-five percent of Mr. Neyman's suggested award was rejected.
 
 
 28
 After reviewing the permissible scope of damages under the ADEA, we conclude that there was adequate evidence in the record to support the actual damages award of $125,000. The judgment of the district court is, therefore, affirmed.
 
 Conclusion
 
 29
 For the reasons stated above, the judgment of the district court is AFFIRMED in all respects.
 
 
 
 *
 Honorable Wayne E. Alley, United States District Judge for the Western District of Oklahoma, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 Mr. Neyman became Personnel and Public Relations Supervisor at corporate headquarters in Kansas City and he held this position for two years after completing his original assignment. Later, the public relations and personnel functions were split and he became the Personnel Supervisor. In 1969, Mr. Neyman accepted a position with another employer in the Kansas City area. He returned to UTC in 1973 as Personnel and Public Relations Manager in Junction City, Kansas, and was promoted to Public Relations and Governmental Affairs Manager, acting as chief lobbyist for UTC during the Kansas legislative session. In 1977, he attained the position of Central Area Manager for Kansas, a position he held for seven years, receiving performance evaluations that were satisfactory or better. Mr. Neyman was responsible for the total operation of his territory, which included approximately 165-200 employees and twenty supervisory staff members. His territory eventually encompassed two-thirds of the State of Kansas
 
 
 [2]
 UTSI was the corporate staffing organization for the system of nine telephone companies affiliated with UTC
 
 
 [3]
 Ample testimony was produced at trial which established that, during Mr. Neyman's twenty-two year career with UTC, he made numerous attempts to cultivate his abilities so he would be better equipped for his duties at UTC. In 1970, he completed an MBA degree at night school while holding down his full time position with UTC; he later completed several hours of continuing education and leadership programs. He served on numerous local and state wide civic organizations, and conducted courses in-house for UTC, including several three day seminars on economic development and safety. His in-house safety program was written about nationally and Mr. Neyman was called upon to lecture on its subject to both the Kansas and Missouri Telephone Associations
 
 
 [4]
 Congress intended to create a two-tiered liability scheme in which liquidated damages are "punitive in nature." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 125 (1985)
 
 
 [5]
 The Supreme Court has held that the back pay provision of Title VII was "expressly modeled on the backpay provision of the National Labor Relations Act" and has looked to cases arising under the act to interpret the scope of back pay in Title VII cases. Moody, 422 U.S. at 419 & n. 11
 
 
 [6]
 Each of the categories listed include a suggested sum of money that would compensate Mr. Neyman for a specific loss he suffered. Items of damages included salary, vehicle allowance, bonus, vacation, IRA benefits, pension, employee stock purchase option, executive stock option and employee income protection plan
 
 
 [7]
 In charging the jury, the district court gave the following instruction:
 If you find that defendants discriminated against the plaintiff because of his age, or retaliated against plaintiff by demoting him and/or subjecting him to adverse treatment after he filed a charge of age discrimination with the Equal Employment Opportunity Commission, or breached a contract of employment with the plaintiff, you will then determine the amount of plaintiff's recovery. You should allow him such amount of money as will reasonably compensate him for any salary and other employment benefits lost by the plaintiff as a result of the defendants' conduct from the date of such conduct until the date of trial.
 
 
 [8]
 In this respect, courts will generally not address issues that were not adequately addressed or ruled upon by the district court. Burnette v. Dresser Indus., Inc., 849 F.2d 1277, 1286 n. 6 (10th Cir.1988). Our review of the record shows that no objection to the jury instructions relating to the sufficiency of the evidence with respect to the damage award proposed by Mr. Neyman under the ADEA was adequately raised, preserved or presented by UTC to the district court. Thus, by its own failure to object at trial or to request a limiting instruction, it is questionable whether this issue is appropriate for consideration on appeal. Farmers Ins. Co. v. Hubbard, 869 F.2d 565, 570 (10th Cir.1989) (citing Bradford v. United States, 651 F.2d 700, 704-05 (10th Cir.1981)); see also Hicks v. Gates Rubber Co., 928 F.2d 966, 970 (10th Cir.1991)
 
 
 [9]
 A jury may draw reasonable inferences from relevant facts, and all doubts are to be resolved in favor of the injured party. E.E.O. v. Kallir, Philips, Ross, Inc., 420 F.Supp. 919 (S.D.N.Y.1976); see also Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65 (1946)