**F I L E D**

**PUBLISH**

**June 7, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Plaintiff-Appellant,

v.

BCI COCA-COLA BOTTLING
COMPANY OF LOS ANGELES,
doing business as Phoenix Coca-Cola
Bottling Company; COCA-COLA
BOTTLING COMPANY OF
ALBUQUERQUE,

     Defendants-Appellees.

No. 04-2220

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CIV 02-1644)**

---

Susan R. Oxford (Eric S. Dreiband, General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, Vincent J. Blackwood, Acting Associate General Counsel, and Lorraine C. Davis, Assistant General Counsel, with her on the briefs), Equal Employment Opportunity Commission, Washington, D.C., for Plaintiff-Appellant.

E. Todd Presnell (Kara E. Shea with him on the brief), Miller & Martin PLLC, Nashville, Tennessee, for Defendants-Appellees.

---

Before **LUCERO**, **McKAY**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

The Equal Employment Opportunity Commission ("EEOC") asks us to reverse the district court's decision granting summary judgment to BCI Coca-Cola Bottling Co. of Los Angeles ("BCI") on a claim of race discrimination arising from the termination of a black employee, Stephen Peters. It is undisputed that the human resources official who made the decision to terminate Mr. Peters worked in a different city, had never met Mr. Peters, and did not even know that he was black. In making the decision to terminate, however, the human resources official relied exclusively on information provided by Mr. Peters' immediate supervisor, who not only knew Mr. Peters' race but allegedly had a history of treating black employees unfavorably and making disparaging racial remarks in the workplace. Because we find that genuine issues of material fact exist as to whether BCI's proffered explanation for the termination is a pretext for racial discrimination, we reverse the decision of the district court and remand for further proceedings.

## I. Factual and Procedural Background

Stephen Peters worked as a merchandiser for BCI at its Albuquerque, New Mexico facility from May 1995 through October 2001. More than 60% of the 200 employees at the Albuquerque facility were Hispanic, while fewer than 2% were black. Merchandisers are hourly employees responsible for placement of

Coca-Cola products in retail outlets such as grocery stores. Their job duties include arranging, cleaning, and rotating product displays and promotional materials. They generally work five days a week, with two days off, but because grocery stores remain open seven days a week, merchandisers' schedules are staggered and they must occasionally work overtime to cover shifts. As the most senior merchandiser in the district, Mr. Peters had the most desirable schedule, with Saturdays and Sundays off. He was generally regarded as a "good merchandiser," and in 2001 he received a certificate from BCI thanking him for five years of "service, dedication and commitment to the Company." App. 143, 151. The certificate specifically thanked him for "being a team player." *Id.* at 151.

Mr. Peters reported to Cesar Grado, a District Sales Manager, who is Hispanic. On a day-to-day basis, Mr. Peters was supervised by a salaried Account Manager, Jeff Katt, who is white. Although both Mr. Katt and Mr. Peters both reported directly to Mr. Grado, who handled all scheduling and route assignments for merchandisers and account managers in his district, it was common for merchandisers to call in sick to the account manager who supervised their work. Mr. Grado was responsible for monitoring and evaluating the employees under his supervision, but was not authorized to discipline or terminate anyone. Instead, Mr. Grado had broad discretion to "bring facts relating to the matter to the attention of [the] Human Resources Department," which was

ultimately responsible for deciding which company policy applied and whether to take any disciplinary action. App. 34. The highest-ranking human resources official in the Albuquerque office was Sherry Pederson. Ms. Pederson's supervisor, Pat Edgar, worked 450 miles away in BCI's Phoenix, Arizona office. Neither Ms. Pederson nor Ms. Edgar had met or even heard of Mr. Peters until September 28, 2001, four days before his termination.

The weekend of September 29–30, 2001, Mr. Grado faced a serious scheduling crunch. Several stores in his district were running ads for Coca-Cola products, necessitating an extra merchandiser for the weekend, and on the morning of Friday, September 28 he learned that another merchandiser who ordinarily worked as a "floater" to cover extra shifts had suffered an on-the-job injury and would be out for a week. Sometime between midday and 2:00 pm on Friday, Mr. Grado directed Mr. Katt to direct Mr. Peters to work on Sunday, September 30.[1] When Mr. Katt relayed the instruction, Mr. Peters responded, "I can't do it. I've got plans." *Id.* at 67. According to Mr. Grado, when Mr. Katt recounted the conversation he added that Mr. Peters said he "might call in sick." *Id.* at 35. Both Mr. Peters and Mr. Katt, however, deny that Mr. Peters said

_____

[1]In his declaration, Mr. Grado stated that he had already discussed the matter with Mr. Katt and Mr. Peters had already agreed to work on Sunday, September 30. It is unclear, then, why he contacted Mr. Katt to order Mr. Peters yet again to work that day. In any case, Mr. Katt denies that Mr. Grado ever contacted him before Friday at 2:00 concerning the possibility that Mr. Peters might work on Sunday.

anything about being sick during that conversation, and Mr. Katt denies passing along any such comment to Mr. Grado.

Frustrated, Mr. Grado decided to seek advice from the Human Resources Department. Ms. Pederson was out of the office on Friday afternoon, so Mr. Grado called Ms. Edgar in Phoenix. Mr. Grado said that he expected Mr. Peters was going to refuse to come to work on Sunday, and asked whether he could require Mr. Peters to come in on his day off. Specifically, he told Ms. Edgar that Mr. Peters planned to call in sick on Sunday. Ms. Edgar found that prospect "unacceptable" because, under BCI policy, an employee may not call in sick two days in advance. *Id.* at 23. She advised Mr. Grado to "find out what the situation was" and, unless Mr. Peters had a "compelling reason" why he could not come to work, to order Mr. Peters to work on Sunday. *Id.* She told Mr. Grado to characterize the instruction as a "direct order" and to say that failure to comply would amount to insubordination, which is grounds for termination. *Id.*

Mr. Grado then paged Mr. Peters, who called immediately. Mr. Grado ordered Mr. Peters to work on Sunday, and Mr. Peters responded that he had plans. Mr. Grado says that he asked Mr. Peters what his plans were, but that Mr. Peters angrily responded that his plans were "none of [Mr. Grado's] business," and started yelling. Mr. Peters says that Mr. Grado never asked his plans; instead, he simply told Mr. Grado that he had plans and that he had not been feeling well all week. They both agree, however, that Mr. Grado said, "I'm not

asking you to come to work, I'm telling you to come to work. If you do not come to work, it could lead to insubordination and could lead to termination." *Id.* at 58. They also agree that the conversation ended with Mr. Peters telling Mr. Grado, "[D]o what [you] got to do and I'll do what I got to do." *Id.* Mr. Peters claims that he intended this statement as a way to end the conversation without a confrontation. Mr. Grado interpreted it as open defiance, and a firm intention to disobey the order to come to work on Sunday.

Late in the afternoon on Friday, Mr. Grado again contacted Ms. Edgar in Phoenix. He related "exactly what had happened": that he had asked Mr. Peters to describe his plans, but that Mr. Peters had refused to say what his plans were, had angrily said his plans were "none of [Mr. Grado's] business," and had told Mr. Grado to "do what he needed to do." *Id.* at 24, 65. Ms. Edgar determined at that time that Mr. Peters'conduct in that conversation, standing alone, amounted to insubordination warranting termination. Nonetheless, because it was late in the day on Friday, she did not make the decision to terminate Mr. Peters that day.

In fact Mr. Peters was sick. On the evening of Saturday, September 29 he cancelled his plans for Sunday and went to an urgent care clinic, complaining of a headache, sinus pain, and cough. A doctor diagnosed him with a sinus infection, gave him a prescription, and directed him not to return to work until Monday, October 1. That night Mr. Peters phoned Mr. Katt and explained that he had just come from the doctor's office and probably could not work Sunday because of

illness. Mr. Katt "said he didn't have any problem with that," but asked Mr. Peters to call in the morning if he felt well enough to work. *Id.* at 197. After hanging up, Mr. Katt repeatedly tried to page Mr. Grado to describe the conversation, but for some reason Mr. Grado never responded to the pages.

Mr. Peters did not work on Sunday, September 30. Mr. Katt and Mr. Grado personally worked routes that day to ensure coverage. Mr. Peters returned to work as usual on Monday morning.

On Monday, October 1, Ms. Edgar held a series of phone calls with Ms. Pederson (who was back in the office) and Mr. Grado concerning Mr. Peters' conduct. Mr. Grado explained that Mr. Peters had not come to work on Sunday. Also, Ms. Pederson pulled Mr. Peters' file and found a Disciplinary Status Notice describing an incident in 1999 where Mr. Peters received a two-day disciplinary suspension and "final warning" for insubordination from a different supervisor. During that incident, the supervisor had called Mr. Peters on a Friday morning and ordered him to work on his day off that weekend. Mr. Peters refused and, according to the status notice, "was rude and unprofessional in his conduct." *Id.* at 53. He was warned that "[a]ll Coca-Cola employees must . . . follow direct orders from their supervisors. Failure to comply is considered a direct act of insubordination . . . . subject to disciplinary action up to and including termination." *Id.* at 54. Although Ms. Edgar did not know it, because the file provides no further details, Mr. Peters had good reason to be upset during the

1999 incident. He had learned earlier that week that his fiancée's son—whom he had raised as his own son for years—had been killed in a car accident. He could not work that Saturday because he had to serve as a pallbearer at the funeral. His supervisor told him that the funeral was no excuse for refusing a direct order because "he was not your biological son." *Id.* at 147.

By the end of the day on Monday, Ms. Edgar made a final decision to terminate Mr. Peters for insubordination. In a declaration prepared as part of this litigation in 2004, Ms. Edgar said that her decision was based "[f]irst and foremost" on "the conduct of Mr. Peters toward Mr. Grado on Friday." *Id.* at 26. The 1999 incident from the file reinforced for Ms. Edgar that Mr. Peters had a track record of insubordination, and also contributed to the decision. She emphasized that "Mr. Peters was not terminated because he did not show up for work on Sunday, except to the extent this conduct is viewed in context with his exchange with Mr. Grado on Friday . . . as the fulfillment of Mr. Peters [sic] stated intention to defy a direct order from Mr. Grado." *Id.* at 27. Ms. Edgar claims that she had already learned, in a conversation with Mr. Grado, that Mr. Peters had been excused by Mr. Katt from work on Sunday, but that this information did not affect her decision. She found Mr. Peters' "alleged sickness" to be "highly suspect," and "found it particularly suspicious that Mr. Peters chose to call in sick to Mr. Katt, rather than Mr. Grado, given the fact that Mr. Peters

had been warned by Mr. Grado the day before that if he did not come to work he would be subject to termination." *Id.* at 27.

Mr. Katt's deposition provides a different account of these events. Mr. Katt says that he did not tell Mr. Grado that Mr. Peters phoned in sick until Monday evening at 6:00 pm, during a discussion of the upcoming week's schedule. Mr. Katt asked which route Mr. Peters was going to cover, and Mr. Grado replied, "I think I'm going to terminate him." *Id.* at 203. Mr. Katt asked, "You do know he called in, he called in sick to me?" *Id.* at 204. Mr. Grado "kind of paused" and asked, "Why didn't you tell me that earlier?" *Id.* Mr. Katt replied, "I did. I tried to page you." *Id.* According to Mr. Katt, this exchange took place Monday evening, after Ms. Edgar already made her decision to terminate Mr. Peters.

Mr. Peters was terminated Tuesday morning, October 2, at a meeting attended by Mr. Peters, Mr. Grado, Mr. Grado's supervisor Don Bateluna, and Ms. Peterson. Mr. Grado began the discussion by announcing, "You've been terminated for insubordination, for not showing up for work." *Id.* at 193. Mr. Peters was promptly presented with a termination paper. That document said nothing about Mr. Peters raising his voice or refusing to explain his plans during the phone conversation on Friday. Instead, the notice states that Mr. Peters had been given a direct order to work on Sunday, and had been warned that "failure to comply with the directive would be considered insubordination and would result

in termination." *Id.* at 41. It concludes, "You did not report to work on Sunday 9-30-01, therefore your employment in [sic] being terminated for insubordination." *Id.* The "violation date" listed is Sunday, September 30, the day Mr. Peters was supposed to come to work, not Friday, September 28, the day of the conversation with Mr. Grado. *Id.*

Mr. Peters explained that he had not reported to work because he was sick. He said that he had called Mr. Katt and had received permission to miss work that day "because I went to the doctor." *Id.* at 193. He protested that "[n]either one of [you] asked me why I didn't show up for work." *Id.* Mr. Peters says that after he told them about the call to Mr. Katt, "they all got quiet. And when I left they shut the door and was [sic] in there talking." *Id.*

Shortly after that meeting, Ms. Pederson called Ms. Edgar and asked whether she knew Mr. Peters was black. Neither Ms. Pederson nor Ms. Edgar had ever met Mr. Peters, and neither knew that he was black until the meeting on Tuesday morning. Apparently Ms. Pederson's inspection of the file was so cursory that she did not even learn basic information such as Mr. Peters' race—which was noted on several documents in his personnel file—even as she was taking steps toward terminating him. Ms. Edgar maintains that "[r]ace played no part whatsoever in my decision to terminate the employment of Stephen Peters." *Id.* at 28. Indeed, part of her job as a human resources official was to

conduct affirmative action and equal employment opportunity training sessions for BCI management.

On October 11, 2001, Mr. Peters filed a charge with the EEOC alleging that his termination was the result of racial discrimination. The EEOC filed suit on his behalf in federal court on December 30, 2002. Its theory was that, even if Ms. Edgar was the sole decisionmaker and she did not know that Mr. Peters was black, "Grado harbored racial animus toward African American employees and . . . this bias was properly imputed to BCI because of Grado's substantial involvement in the termination process as Peters' supervisor and Edgar's sole source of information about the events on which BCI alleges the termination was primarily based." Aplt. Br. 12. Relying principally on cases from other circuits, the EEOC characterized this claim as arising under a "cat's paw" or "rubber stamp" theory, whereby an employer may be liable for the acts of a biased subordinate, even if that subordinate is not the formal decisionmaker.

In support of its allegations concerning Mr. Grado's racial bias, the EEOC presented affidavits from a number of other BCI employees. Three other merchandisers who worked under the supervision of Mr. Grado—two black and one Hispanic—stated that Mr. Grado treated black employees worse than employees of other races. App. 181 (affidavit of James Young) ("African American employees were treated worse by Cesar Grado as compared to non-African American employees."); *id.* at 183 (affidavit of Bryan Esquibel) ("If

Grado did not like you, he treated you badly; but African American employees were treated even worse."); *id.* at 185 (affidavit of Michael Wilson) ("It is my belief that Cesar Grado dislikes African Americans based on his treatment of me during my employment at [BCI].").  All three cited specific examples of incidents in which Mr. Grado subjected black employees to greater scrutiny and more serious discipline than Hispanic employees.  Mr. Wilson, who is black, says that Mr. Grado "continually demeaned me and threatened to replace me" but always "treated Hispanic Merchandisers with respect."  *Id.* at 185.

Mr. Wilson also "recall[ed] many race-based remarks made to me by Cesar Grado during work hours."  *Id.* at 184.  According to Mr. Wilson, Mr. Grado told jokes about black men dating Anglo women, and stated that "Black guys [do] not look good in trucks, they should drive Cadillacs."  *Id.* at 185.  One day, while watching Mr. Wilson clean an outdoor vending machine during the winter, Mr. Grado urged him to hurry because "brothers don't like the cold."  *Id.* (internal quotation marks omitted).  Also, Mr. Katt says that after the termination, during a drive to a work site, Mr. Grado asked, "Did you hear Steve is trying to sue me?"  *Id.* at 212.  Although he is less than "100 percent clear" about his recollection of the conversation, Mr. Katt says that Mr. Grado may have used the word "nigger" or a comparable racial epithet to describe Mr. Peters during that conversation.  *Id.*

The EEOC also compared Mr. Grado's treatment of Mr. Peters with his treatment of Hispanic employees under similar circumstances.  On one occasion,

for example, Mr. Grado was short merchandisers during a busy weekend, so he directed Mr. Katt to direct Monica Lovato, a Hispanic merchandiser, to work one of her days off. Ms. Lovato planned to celebrate her birthday that weekend, and she told Mr. Katt she wanted both days off, but Mr. Katt insisted and tried to accommodate her schedule as much as possible. That weekend Ms. Lovato never showed up to work as directed, even after Mr. Katt paged her repeatedly. When he was informed that Ms. Lovato had disobeyed an order to come into work, Mr. Grado never inquired about her reasons. Instead, Mr. Grado remarked, "You can't make somebody work one of their days off." *Id.* at 211. Ms. Lovato never received any discipline—not even a warning—as a result of the incident.

The district court granted summary judgment in favor of BCI. Operating within the *McDonnell Douglas* burden-shifting framework, it held that the EEOC had established a prima facie case of discrimination, but that BCI had articulated a legitimate nondiscriminatory reason for the termination: "his insubordinate conduct toward Grado." Mem. Op. & Order 19. It held that no genuine issue of material fact exists as to whether this proffered explanation was pretextual because the pretext inquiry must focus exclusively on whether Ms. Edgar honestly believed that Mr. Peters was guilty of insubordination on Friday, September 28. Citing our statement in *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000), that pretext must be evaluated by "look[ing] at the facts as they appear to the person making the decision to terminate plaintiff,"

the district court concluded that any factual disputes concerning the Friday conversation were immaterial because Ms. Edgar correctly applied BCI's policy concerning insubordination to the facts as she understood them. Mem. Op. & Order 24–25. The district court found the termination letter ("You did not report to work on Sunday 9-30-01, therefore your employment [is] being terminated for insubordination") "consistent" with Ms. Edgar's declaration that the sole act of insubordination for which he was terminated was his conduct during the call on Friday. *Id.* at 26. According to the district court, the phone call and the failure to come to work formed part of the same "chain of events," and no reasonable jury could find that BCI's explanations were shifting or inconsistent.

In evaluating the EEOC's "rubber stamp" or "cat's paw" claim, the district court acknowledged that the EEOC had raised a genuine issue of fact as to whether Mr. Grado harbored racial bias against African Americans. It noted, however, that other circuits' "rubber stamp" cases "involved situations in which a decision-maker accepted the *recommendations* of a biased supervisor without conducting an independent investigation." *Id.* at 29 (emphasis in original). Here, Mr. Grado never officially recommended that Mr. Peters be terminated; he merely provided information to Ms. Edgar, who made the final decision. Also, according to the district court, Ms. Edgar *did* conduct an independent investigation: she asked Ms. Pederson to pull Mr. Peters' personnel file. The issue of Mr. Grado's bias therefore was not material.

The district court granted BCI's motion for summary judgment, and the EEOC now appeals. We review the district court's decision *de novo*, viewing the evidence in the light most favorable to the EEOC and drawing all reasonable inferences in its favor. *Fuerschbach v. S.W. Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006). We will affirm "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and BCI is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

## II. Discussion

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of establishing a prima facie case of racial discrimination, which "consists of a showing that (1) the plaintiff belongs to some protected class, (2) the plaintiff was qualified for the position or benefit at issue, (3) the plaintiff suffered an adverse employment action, and (4) the plaintiff was treated less favorably than others (e.g., the position at issue remained open after the adverse employment action)." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004). BCI concedes that the EEOC has established a prima facie case here: Mr. Peters is black, he was qualified for his job as a merchandiser, he was terminated, and the position remained open.

The burden therefore shifts to BCI to articulate a legitimate, nondiscriminatory reason for the employment action. *Jaramillo v. Colo. Judicial*

- 15 -

*Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005).  The EEOC concedes that BCI has articulated a nondiscriminatory reason for its termination of Mr. Peters: his insubordination on Friday, September 28 during the phone conversation with Mr. Grado.  Significantly, BCI maintains that Mr. Peters' absence on Sunday, September 30 had nothing to do with the decision, except insofar as it confirmed that Mr. Peters' statements on Friday were insubordinate.  App. 27 ("Mr. Peters was not terminated because he did not show up for work on Sunday . . . .").

The sole issue on appeal is whether the EEOC has made a sufficient showing that BCI's proffered explanation is a pretext for race discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).  Here, it is undisputed that Ms. Edgar, who formally made the termination decision, worked in a different city and had no idea that Mr. Peters is black.  She therefore could not have acted for racially discriminatory reasons.  For the EEOC to prevail, it must make not only a factual showing that Mr. Grado harbored racial animus toward black employees, but also a convincing legal claim that his racial animus should be imputed to BCI despite the fact that Mr. Grado had no power to terminate anyone.

## A.  Subordinate Bias Liability

Other courts have recognized claims under Title VII based on the bias of a subordinate, often using the terms "cat's paw" or "rubber stamp" to describe the theory.  The "cat's paw" doctrine derives its name from a fable, made famous by

- 16 -

La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire. *See* Fables of La Fontaine 344 (Walter Thornbury trans., Chartwell Books 1984). As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none left for the cat. *Id.* Today the term "cat's-paw" refers to "one used by another to accomplish his purposes." Webster's Third New International Dictionary Unabridged 354 (2002). In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action. *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). The "rubber stamp" doctrine has a more obvious etymology, and refers to a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288 (4th Cir. 2004) (en banc). Our sister circuits overwhelmingly have endorsed some version of these doctrines. *See Galdamez v. Potter*, 415 F.3d 1015, 1026 n.9 (9th Cir. 2005); *Hill*, 354 F.3d at 290; *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999); *Griffin v. Wash. Convention Ctr.*, 142 F.3d 1308, 1311–12 (D.C. Cir. 1998); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354–55 (6th Cir. 1998); *Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir. 1996); *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1213–14

(3d Cir. 1995); *Stacks v. S.W. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir. 1994); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (Posner, J.) (inaugurating the descriptor "cat's-paw" for this category of claim).

Although this Court has not yet had occasion to find for a plaintiff on a subordinate bias claim, we have strongly signaled our endorsement of the theory. We have stated that "under certain circumstances, a defendant may be held liable for a subordinate employee's prejudice even if the manager lacked discriminatory intent." *English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1011 (10th Cir. 2001). Specifically, we have described a "rubber stamp" theory of liability, noting that "[t]o recover under this theory, the plaintiff must show 'that the decisionmaker followed the biased recommendation [of a subordinate] without independently investigating the complaint against the employee.'" *Id.* (quoting *Stimpson*, 186 F.3d at 1332) (alteration in original). Twice we have held that a plaintiff could not prevail because the decisionmaker had conducted an independent investigation of the facts, rather than relying entirely on the recommendation of the biased subordinate. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231–32 (10th Cir. 2000) (finding it "[i]mportant[]" that "in the course of his investigation" the decisionmaker asked the employee "to give his version of the exchange," but the employee declined to do so); *English*, 248 F.3d at 1011 (noting that the decisionmaker met twice with the employee and his attorney, and specifically asked for evidence rebutting or mitigating the findings of the

allegedly biased subordinates).  But we have described the plaintiffs' underlying theory of liability as "correct."  *English*, 248 F.3d at 1011.

These subordinate bias theories comport with the basic agency principles incorporated by statute into Title VII.  For purposes of Title VII, the term "employer" includes not only any "person engaged in an industry affecting commerce" but "any agent of such a person."  42 U.S.C. § 2000e(b).  Although that language "surely evinces an intent to place some limits on the acts of employees for which employers are to be held responsible," *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986), employers may be vicariously liable for the actions of their employees—even intentional torts outside the scope of their employment—if the employee "'was aided in accomplishing the tort by the existence of the agency relation,'" *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758 (1998) (quoting Restatement (Second) of Agency § 219(2)(d) (1958) [hereinafter Restatement]).  In *Ellerth*, which involved a hostile work environment claim, the Supreme Court held that "a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer." *Id.* at 762.  Citing with approval the seminal "cat's paw" opinion by Judge Posner, the Court seemed unconcerned with the possibility that the "tangible employment decision[]" might "be subject to review by higher level supervisors." *Id.* (citing *Shager*, 913 F.2d at 405).  The "aided by the agency relation" standard applies even more clearly to subordinate bias claims, such as "cat's paw" or

"rubber stamp" claims, because the allegedly biased subordinate accomplishes his discriminatory goals by misusing the authority granted to him by the employer—for example, the authority to monitor performance, report disciplinary infractions, and recommend employment actions. *See* Restatement § 219(2) cmt. e (explaining that the "aided by the agency relation" standard applies in situations where "the servant may be able to cause harm because of his position"); *cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 802–05 (1998) (contemplating vicarious liability based on abuse of authority by supervisors, but emphasizing that the "aid" in the "aided by the agency relation" formula must amount to more than access to a pool of potential victims and "the unspoken suggestion of retaliation").

Holding employers accountable for the actions of biased subordinates also advances the purposes of Title VII. It should go without saying that a company's organizational chart does not always accurately reflect its decisionmaking process. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151–52 (2000) (finding that the bias of a supervisor, the husband of the formal decisionmaker, could be imputed to the company because the supervisor "was the actual decisionmaker" and was "principally responsible for petitioner's firing"); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000) (noting that "courts will not blindly accept the titular decisionmaker as the true decisionmaker"). A biased low-level supervisor with no disciplinary authority

might effectuate the termination of an employee from a protected class by recommending discharge or by selectively reporting or even fabricating information in communications with the formal decisionmaker. Recognition of subordinate bias claims forecloses a strategic option for employers who might seek to evade liability, even in the face of rampant race discrimination among subordinates, through willful blindness as to the source of reports and recommendations. *Id.* n.13 (holding that employers may not insulate themselves from Title VII claims simply "by ensuring that the one who performed the employment action was isolated from the employee"). Indeed, such claims have the salutary effect of encouraging employers to verify information and review recommendations before taking adverse employment actions against members of protected groups—particularly if, as we have held, an employer can escape liability entirely by performing an independent investigation. *See English*, 248 F.3d at 1011. Construing the definition of an "employer" to permit subordinate bias claims therefore serves Title VII's "deterrent purpose." *See Ellerth*, 524 U.S. at 764 (noting that the extent of employer liability under Title VII should not depend exclusively on common-law agency principles, but also should encourage employer procedures that prevent discriminatory actions).

Despite broad support for some theory of subordinate bias liability, our sister circuits have divided as to the level of control a biased subordinate must exert over the employment decision. Some courts take a lenient approach,

formulating the inquiry as whether the subordinate "possessed leverage, or exerted influence, over the titular decisionmaker." *See Russell*, 235 F.3d at 227. On this view, "summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994) (citing *Shager*, 913 F.2d at 405). This standard apparently contemplates that any "influence," the reporting of any "factual information," or any form of "other input" by a biased subordinate renders the employer liable so long as the subordinate "may have affected" the employment action. Such a weak relationship between the subordinate's actions and the ultimate employment decision improperly eliminates a requirement of causation. *See Ellerth*, 524 U.S. at 745 (construing Title VII "to accommodate the agency principle of vicarious liability for harm *caused by* misuse of supervisory authority" (emphasis added)). When a biased subordinate merely plays a peripheral role, it cannot be said that he has "accomplish[ed]" a tortious act and "cause[d] harm" as required under agency law principles and, accordingly, under Title VII. Restatement § 219(2)(d) & cmt. e; *see also id.* cmt. a ("Rationale of liability") ("The assumption of control is a usual basis for imposing tort liability when the thing controlled causes harm."). Moreover, a lenient "may have affected" standard that punishes employers for any "input"—no matter how minor—weakens the deterrent effect of subordinate bias claims by

imposing liability even where an employer has diligently conducted an independent investigation.

At the opposite extreme, the Fourth Circuit has held that an employer cannot be held liable even if a biased subordinate exercises "substantial influence" or plays a "significant" role in the employment decision. *Hill*, 354 F.3d at 291. Taking its cue from the Supreme Court's statements in *Reeves* that "petitioner [had] introduced evidence that [the supervisor] was the actual decisionmaker" and was "principally responsible" for his firing, *Reeves*, 530 U.S. at 151–52, the Fourth Circuit held that these formulations mark "the outer contours of who may be considered a decisionmaker for purposes of imposing liability upon an employer." *Hill*, 354 F.3d at 289. On this view, the decisionmaker must be a "cat's paw" so completely beholden to the subordinate "that the subordinate is the actual decisionmaker." *Id.* at 290. The Fourth Circuit's strict approach makes too much of the phrase "actual decisionmaker" in *Reeves*; the Court was describing what the petitioner's evidence showed, not prescribing the "outer contours" of liability. *See Reeves*, 530 U.S. at 151–52 (using the phrases "actual decisionmaker" and "principally responsible" only in Part III.B, which begins, "Applying this standard here . . ."). The Fourth Circuit's peculiar focus on "who is a 'decisionmaker' for purposes of discrimination actions," *Hill*, 354 F.3d at 286, seems misplaced. The word "decisionmaker" appears nowhere in Title VII. Instead, the statute imposes

liability for discrimination by employers and their agents, 42 U.S.C. § 2000e(b), which in accordance with agency law principles includes not only "decisionmakers" but other agents whose actions, aided by the agency relation, cause injury. *Ellerth*, 524 U.S. at 760. The Fourth Circuit's standard also undermines the deterrent effect of subordinate bias claims, allowing employers to escape liability even when a subordinate's discrimination is the sole cause of an adverse employment action, on the theory that the subordinate did not exercise complete control over the decisionmaker.

We find ourselves in agreement with the Seventh Circuit, which has rejected the Fourth Circuit's approach as "inconsistent with the normal analysis of causal issues in tort litigation." *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004). To prevail on a subordinate bias claim, a plaintiff must establish more than mere "influence" or "input" in the decisionmaking process. Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action. *Id.* This standard comports with the agency law principles that animate the statutory definition of an "employer." *See* Restatement § 219 (describing the scope of a master's liability "for the torts of his servants" and thereby incorporating standard tort concepts like causation). Both the Supreme Court and this Court require a comparable causal connection as part of analogous workplace discrimination claims. *See, e.g.*, *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (requiring a

"causal connection" between the plaintiff's protected activities and the adverse employment action in a Title VII retaliation claim); *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994) (requiring a "causal nexus" between allegedly discriminatory workplace statements and the termination decision in an ADEA claim).  We reaffirm our earlier decisions holding that, because a plaintiff must demonstrate that the actions of the biased subordinate caused the employment action, an employer can avoid liability by conducting an independent investigation of the allegations against an employee.  *English*, 248 F.3d at 1011.  In that event, the employer has taken care not to rely exclusively on the say-so of the biased subordinate, and the causal link is defeated.  Indeed, under our precedent, simply asking an employee for his version of events may defeat the inference that an employment decision was racially discriminatory.  *Kendrick*, 220 F.3d at 1231–32.  Employers therefore have a powerful incentive to hear both sides of the story before taking an adverse employment action against a member of a protected class.

Finally, we address the district court's conclusion that an employer may be liable on a subordinate bias theory only if the decisionmaker receives and approves an explicit recommendation to terminate an employee.  Regrettably, subordinate bias cases have suffered from an abundance of vivid metaphors.  The Fourth Circuit, for example, seems to have taken the "cat's paw" metaphor too literally in deriving its total-control-over-the-actual-decision standard.  *Lust*, 383

F.3d at 584. Likewise, the district court in this case seems to have taken the "rubber stamp" metaphor too literally, requiring that an explicit recommendation must cross the desk of the decisionmaker, regardless of whether the subordinate's discriminatory actions in fact caused the termination. That limitation of subordinate bias claims not only runs counter to the fairly broad "aided by the agency relation" principle embodied in Title VII, but would leave employees unprotected so long as a subordinate stops short of mouthing the words "you should fire him," in person or on paper, to the decisionmaker. Stripped of their metaphors, subordinate bias claims simply recognize that many companies separate the decisionmaking function from the investigation and reporting functions, and that racial bias can taint any of those functions. We see no reason to limit subordinate bias liability to situations that closely resemble the "cat's paw," "rubber stamp," "conduit," "vehicle," or other metaphors that imaginative lawyers and judges have developed to describe such claims.

With these principles in mind, we turn to BCI's decision to terminate Mr. Peters.

## B. The Subordinate Bias Claim in this Case

The EEOC argues that BCI's proffered explanation for its termination decision is pretextual. To survive summary judgment on a subordinate bias theory, the plaintiff must first establish a genuine issue of material fact concerning the bias of the subordinate. It must then establish genuine issues of

material fact as to whether the proffered reason for the employment action is pretextual, which in a subordinate bias claim requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision.

### 1.  Mr. Grado's Racial Bias

The district court held, and we agree, that the EEOC has raised a genuine issue of fact concerning Mr. Grado's racial animus.  In general, "isolated racial comments" are insufficient to establish pretext unless they "can somehow be tied to the employment actions disputed in the case at hand." *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1289 (10th Cir. 2000) (internal quotation marks omitted).  Nonetheless, at the summary judgment stage "all rational inferences from the evidence must be made in favor of the party opposing the summary judgment motion." *Ortiz v. Norton*, 254 F.3d 889, 896 (10th Cir. 2001).  In *Ortiz*, we held that evidence of discrimination in employment decisions affecting other workers "could support an inference that the decision makers harbored a bias against Hispanics which might have affected other decisions, including the decisions adverse to plaintiff." *Id.*  A plaintiff also "may show pretext 'by providing evidence that he was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness,'" provided the "similarly situated" employee shares the same supervisor, is subject to the same performance standards, and otherwise faces comparable "relevant

employment circumstances." *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005) (quoting *Kendrick*, 220 F.3d at 1232).

In this case, the EEOC has produced sufficient evidence to create a jury question concerning Mr. Grado's racial animus. Mr. Wilson claims that Mr. Grado directed "many race-based remarks," and offered three examples of racial jokes and put-downs. App. 184–85. In his affidavit, Mr. Katt says that Mr. Grado may have used a racial epithet to describe Mr. Peters in the immediate aftermath of the termination and lawsuit.[2] *Id.* at 212. These comments may have been infrequent, but they certainly were not "isolated": they were directed at other black merchandisers under Mr. Grado's supervision, suggesting a pattern of racial bias in disciplinary matters that could have affected Mr. Grado's conduct with respect to Mr. Peters' termination, and in one case concerned Mr. Peters himself.

---

[2]BCI argues, in a footnote and without elaboration, that Mr. Katt's testimony on this point "is clearly inadmissible pursuant to Federal Rules of Evidence 602 and 403," and therefore should be ignored. Br. of Appellee 41 n.17. The first objection is obviously wrong. Rule 602 requires that a witness must have "personal knowledge of the matter" before testifying, but Mr. Katt's affidavit recounts a conversation he personally conducted with Mr. Grado. The second objection is difficult to discern. Rule 403 provides that evidence "may be excluded" if, in the view of the district court, "its probative value is substantially outweighed by the danger of unfair prejudice." If credited, Mr. Katt's testimony about a racial slur directed at Mr. Peters shortly after his termination is at least probative of Mr. Grado's motive at the time of the termination. Like the district court, which considered the testimony, *see* Mem. Op. & Order 14, we are not inclined to ignore the testimony as unduly prejudicial at this stage.

In addition, three other merchandisers—two black and one Hispanic—submitted affidavits giving specific examples of Mr. Grado's disparate treatment of black and Hispanic merchandisers. Mr. Young claims that Mr. Grado "nit-pick[ed] my work" and "constantly threatened to change my days off and to change my route," but "did not . . . treat non-African American employees in this manner." App. 181. He recalls being threatened with a schedule change for leaving the back room of one of his stores "a bit messy," while Mr. Grado tolerated a non-black merchandiser's "very messy" back room "many times." *Id.* Mr. Esquibel named six Hispanic employees who were not fired after disobeying company directives. *Id.* at 183. Mr. Wilson says that Mr. Grado was "unusually picky" with black merchandisers, "often calling us back to stores that had been serviced to redo some minor detail, while the Hispanic Merchandisers were not subject to this same level of scrutiny." *Id.* at 185. Broadly, he claims that Mr. Grado "treated Hispanic Merchandisers with respect" but "continually demeaned me and threatened to replace me." *Id.*

Most importantly, the EEOC produced evidence of Mr. Grado's unfazed response to the incident involving a Hispanic merchandiser, Ms. Lovato. Like Mr. Peters, Ms. Lovato reported to Mr. Grado and was directed to work one of her days off. Like Mr. Peters, she failed to come to work, in direct violation of her instructions and in spite of considerable efforts by Mr. Katt to come to accommodate her schedule. Unlike Mr. Peters, who was fired two days later, Ms.

Lovato received no discipline whatsoever as a result of the incident, with Mr. Grado reportedly saying, "You can't make somebody work one of their days off." *Id.* at 211. To be sure, there are factual differences between these incidents: Ms. Lovato received all of her orders through Mr. Katt whereas Mr. Peters spoke to Mr. Grado directly, and Ms. Lovato initially acquiesced in the orders (before disobeying them) whereas, according to Mr. Grado, Mr. Peters initially behaved in a defiant manner and announced an intention to disobey the orders (before being excused from work). They are similar enough, however, that in light of the dramatic difference between Mr. Grado's actions in each case, as well as the other evidence of discriminatory conduct, a reasonable jury could find the situations comparable and infer that racial animus played a role in Mr. Peters' treatment.

We do not necessarily believe that each of the incidents recounted above would support a charge of discrimination in isolation, but taken as a whole, this evidence of racial comments and disparate treatment of black merchandisers creates a genuine issue of fact regarding Mr. Grado's racial bias.

### 2. *Pretext and Causation*

To show that an employer's proffered nondiscriminatory reason for an employment action is pretextual, a plaintiff must produce evidence of "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that

the employer did not act for the asserted non-discriminatory reasons.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olsen v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)). Because the EEOC's pretext argument depends in part on a subordinate bias theory, it must establish a genuine issue of material fact as to whether Mr. Grado's bias translated into discriminatory actions that caused Mr. Peters' termination.

BCI now maintains that it fired Mr. Peters solely because of his defiant conduct on the phone with Mr. Grado on Friday, and that "Mr. Peters was not terminated because he did not show up for work on Sunday, except to the extent this conduct is viewed . . . as the fulfillment of [his] stated intention to defy a direct order from Mr. Grado." App. 27. On this theory, missing work on Sunday merely confirmed that Mr. Peters' statements on Friday were insubordinate, and did not serve as a basis for dismissal. Yet the first explanation provided by Mr. Grado at the Tuesday morning meeting was, "You've been terminated for insubordination, *for not showing up for work*." *Id.* at 193 (emphasis added). The Disciplinary Status Notice unequivocally states that the failure to show up for work on Sunday *was* the act of insubordination: "You did not report to work on Sunday 9-30-01, therefore your employment in [sic] being terminated for insubordination." *Id.* at 41. That document lists Sunday, not Friday, as the date of the violation that prompted the termination, indicating that the act of insubordination was the failure to come into work, not Mr. Peters' attitude during

the earlier phone call. Indeed, on October 16, 2001, just two weeks after the termination, Ms. Pederson filed paperwork with the New Mexico Department of Labor stating that "Stephen was told by Cesar Grado that *if he didn't show up*, it would be considered insubordination." *Id.* at 165 (emphasis added). When asked to describe the "final incident that caused the discharge," Ms. Pederson wrote, "Stephen did not show up for work on 9/30." *Id.* Only later did BCI characterize its decision to fire Mr. Peters as hinging on his defiant conduct over the phone, rather than on his absence.

A jury might reasonably conclude that BCI's original explanation, that Mr. Peters was fired because he failed to show up for work on Sunday, was pretextual because Mr. Peters was excused from work that day. Mr. Peters was in fact sick, had visited an urgent care clinic, and had been diagnosed with a sinus infection and directed not to work until Monday. He phoned Mr. Katt to report the illness, and was excused from work—an interaction that BCI concedes is perfectly ordinary between merchandisers and account managers. A jury could credit Ms. Edgar's statements that she knew that Mr. Peters' absence was excused and nonetheless (incorrectly, as it turns out) deemed Mr. Peters' "alleged sickness" suspicious under the circumstances. But it might just as easily credit Mr. Katt's testimony, rather than Ms. Edgar's, and conclude that neither Mr. Grado nor Ms. Edgar learned that Mr. Peters called in sick until the scheduling discussion between Mr. Katt and Mr. Grado on Monday evening, after Ms. Edgar claims she

had already made the decision to fire Mr. Peters. The affidavits of Mr. Katt and Mr. Peters state that key players in the decision fell silent upon hearing that Mr. Peters' absence was excused, suggesting that they were indeed surprised by the news.

Recognizing the weakness of the original explanation, BCI has refined its position by relying entirely on Mr. Peters' purported insubordination in his conversation with Mr. Grado on Friday. A jury could conclude, however, that this reason too is a pretext for race discrimination, as the result of Mr. Grado's racial animus. It is undisputed that Ms. Edgar, and Ms. Edgar alone, made the formal termination decision. Mr. Grado has succinctly described his role in the disciplinary process: "I gather the facts and I present them to our HR department, and they decide whether it is an insubordination or not and whether there's action to be taken or not." App. 63. Surely Ms. Edgar harbored no ill will toward Mr. Peters on account of his race, because she worked in Phoenix and did not even know that he was black. Yet it is also undisputed that Ms. Edgar relied exclusively on Mr. Grado's account of the Friday phone conversation in making her decision. She conducted no independent inquiry into the events that took place that Friday, and failed to take even the basic step—cited by this Court in *Kendrick*, 220 F.3d at 1231–32—of asking Mr. Peters for his side of the story. Accordingly, Mr. Grado's report that Mr. Peters had behaved in a defiant, insubordinate manner on Friday caused the termination. If the jury concludes that

Mr. Grado's report was tainted by race discrimination—as it might, for the reasons explained above—it could also find that the proffered reason for firing Mr. Peters, which rests entirely on that report, is pretextual.

BCI argues that any factual disputes concerning the Friday conversation between Mr. Grado and Mr. Peters are immaterial because both parties agree that Mr. Peters ended the conversation by saying, "[D]o what [you] got to do and I'll do what I got to do." App. 58. We agree that this statement can only be interpreted as defiance, and if Mr. Grado had reported nothing but this closing remark to Ms. Edgar, there would be no reason to believe that racial bias on the part of Mr. Grado caused the termination. Yet Mr. Grado reported several additional facts about his conversations on Friday afternoon. First, he told Ms. Edgar that he had learned, through Mr. Katt, that Mr. Peters was already planning to call in sick two days later, in violation of company policy. Second, he reported that in their phone call Friday afternoon, he asked Mr. Peters to describe his plans, affording an opportunity for Mr. Peters to explain his scheduling conflict. Third, he reported that Mr. Peters angrily replied that it was "none of [your] business," and was "yelling" during the discussion. *Id.* at 36, 65.

All of those facts are disputed. Instead of crediting Mr. Grado's testimony, a jury might believe Mr. Katt, who says that he never told Mr. Grado that Mr. Peters had advance plans to call in sick on Sunday, or Mr. Peters, who says that he simply told Mr. Grado that he had been feeling sick that week, not that he

planned to violate company policy. A jury might also credit Mr. Peters' version of the Friday afternoon conversation, in which Mr. Grado never bothered to ask Mr. Peters' reasons, Mr. Peters never refused to answer Mr. Grado's questions, and Mr. Peters remained calm throughout the discussion. There is good reason to believe that Ms. Edgar acted on those additional facts, not just on Mr. Peters' "do what you have to do" remark. She denounced Mr. Peters' advance plans to call in sick as "not acceptable," an abuse of the company sick leave policy. *Id.* at 23. Also, it was Ms. Edgar who originally insisted that Mr. Grado "find out what the situation was" and determine whether Mr. Peters had a "compelling reason" he could not come to work, which suggests that she found that information important in making her decision. *Id*. at 23. Taking the evidence in the light most favorable to the EEOC, it is easy to imagine that the additional details of Mr. Grado's account, in which Mr. Peters appeared to be fabricating his illness, started yelling at his supervisor, and refused to answer questions, led Ms. Edgar to characterize the conversation as "insubordination" warranting dismissal. The question is not whether Ms. Edgar *could have* terminated Mr. Peters because of his closing remark alone, which appears to have been permissible under BCI policy, but what *actually did* cause the adverse employment action. If a jury credits the testimony of Mr. Peters and Mr. Katt, and thus concludes that Mr. Grado lied to Ms. Edgar, it could also find that the additional claims about Mr. Peters' conduct caused the termination.

Finally, BCI argues, and the district court agreed, that Ms. Edgar did not rely solely on Mr. Grado but conducted an independent investigation. This investigation consisted of exactly one action: directing Ms. Pederson to pull Mr. Peters' personnel file. We find this "investigation" inadequate, as a matter of law, to defeat the inference that Mr. Grado's racial bias tainted the decision. Obviously the file contained no information about the recent incident involving Mr. Grado, so it is difficult to see how reading it could "independently" confirm what had happened. True, the file contained a description of a 1999 incident of insubordination, which (despite its ignoble back story) seemed consistent with Mr. Grado's version of events. The problem is that Ms. Edgar never sought any other version of events, and therefore had no reason other than Mr. Grado's report to believe that the file was relevant. Simply pulling the file therefore does not constitute an independent investigation, and a jury could conclude that Mr. Grado's factually disputed report—the sole source of information on which Ms. Edgar relied—caused the termination.

Because the EEOC has established genuine issues of material fact as to whether the nondiscriminatory reasons offered by BCI are pretextual, summary judgment was inappropriate.

### III. Conclusion

We **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.