**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 25, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KARRY L. THOMAS,

     Plaintiff - Appellant,

v.

BERRY PLASTICS CORPORATION,

    Defendant - Appellee.

No. 14-3100

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:12-CV-02565-KHV)**
_____

Alan V. Johnson (Danielle N. Davey, with him on the briefs) Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., Topeka, Kansas, for Plaintiff-Appellant.

Josh C. Harrison (Elmer E. White, III, The Kullman Firm, Birmingham, Alabama, and John T. Bullock, Stevens & Brand, L.L.P., Lawrence, Kansas, with him on the brief) The Kullman Firm, Birmingham, Alabama, for Defendant-Appellee.
_____

Before **TYMKOVICH**, **EBEL**, and **GORSUCH**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

    Plaintiff-Appellant Karry L. Thomas—who is African American—worked for

Defendant-Appellee Berry Plastics Corporation ("Berry") from 2003 to 2010.

Following his termination, Thomas sued Berry, alleging that Berry terminated him in

retaliation for opposing racial discrimination within the company. The district court granted summary judgment in favor of Berry. Exercising our jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## I. Facts

Taking the facts in the light most favorable to Thomas, see Ward v. Jewell, 772 F.3d 1199, 1202 (10th Cir. 2014), the record established the following:

From 2003 to 2010, Thomas was employed by Berry, which owns and operates over seventy manufacturing plants throughout North America. Thomas was initially hired as a Printing Operator in Berry's Kansas facility, but after a few years, he was promoted to Printing Technician. As a Printing Technician, Thomas was responsible for setting up the machines and ensuring that they ran properly.

Over the course of Thomas's seven-year employment, eight different Berry supervisors initiated at least thirteen disciplinary actions against him. These actions ranged in severity from verbal coaching and written warnings to suspensions and final warnings.

According to Thomas, the series of events leading up to his termination began in May 2009, when Jason Morton became Thomas's group leader. As group leader, Morton had limited disciplinary authority. Although Morton's limited authority prevented him from independently issuing high levels of discipline (e.g., suspensions, last chance agreements, final warnings, and terminations), he nonetheless played some role in most of the disciplinary actions leading up to Thomas's termination in September 2010.

2

The most relevant of these actions began in July 2010, when Morton, after conferring with his supervisor, suspended Thomas for a print-quality issue. As a result of this suspension and a prior suspension issued by a different supervisor two months earlier, Printing Manager Watson—who oversaw the entire Kansas operation—executed a Last Chance Agreement with Thomas. This agreement provided that Thomas would be "subject to disciplinary action, up to and including termination of employment, for future rules or attendance violations." Suppl. App. at 105. Morton was not involved in the decision to place Thomas on a Last Chance Agreement.

A few weeks later, Morton, acting pursuant to Watson's and Human Resources' direction, gave Thomas a Final Warning. This Final Warning, which indicated that Thomas's employment would be terminated if he had any further quality or performance related issues, was based on Thomas's alleged failure to pack product properly on July 27. When Morton and two other Berry representatives met with Thomas to discuss this Final Warning, Thomas maintained that he did not fail to pack the product properly on July 27 and stated that he felt he was "getting discrimination because of race." App. at 86. Upon further investigation, Morton discovered that the July 27 packing problem was not Thomas's fault and rescinded the related performance issue.

Thereafter, Morton submitted a report to Printing Manager Watson that faulted Thomas for a print-quality issue that occurred on September 10. After reviewing this incident and without consulting Morton, Watson decided to terminate Thomas's

employment. Before Human Resources could review and approve Watson's termination decision, Morton, acting pursuant to another supervisor's instructions, issued a written warning to Thomas based on another incident wherein Thomas failed to complete paperwork. Shortly thereafter, Berry officially terminated Thomas's employment.

Thomas initially challenged his termination through Berry's Termination Review Process,[1] arguing that his termination was not warranted because he was not at fault for the September 10 print-quality issue. After meeting with Thomas and reviewing his full disciplinary history, the Termination Review Panel—which was comprised of two independent Berry managers—affirmed Watson's termination decision.

Thomas thereafter filed suit for wrongful discharge, alleging, *inter alia*, that he was terminated in retaliation for opposing race discrimination in violation of Title VII and 42 U.S.C. § 1981.[2] Berry moved for summary judgment. Although Thomas initially argued that Printing Manager *Watson* possessed retaliatory animus that infected his termination decision, Thomas eventually invoked the "cat's-paw" theory of recovery, arguing that it was *Morton*—an intermediate supervisor who reported to

_____

[1] Pursuant to Berry's company policy, "termination review" is an appeal process available as a benefit to employees in the event of involuntary termination. Suppl. App. at 25.

[2] Thomas also alleged age and race discrimination. We do not consider the age-discrimination claim because Thomas does not pursue it on appeal. We also do not consider the race-discrimination claim because Thomas waived the pretext theory—the only theory of recovery for race discrimination he offers on appeal—by failing to argue pretext below. See Campbell v. City of Spencer, 777 F.3d 1073, 1080 (10th Cir. 2014).

Watson—who possessed the retaliatory animus that infected Watson's termination decision.[3] Under a cat's-paw theory of recovery (also known as "subordinate bias" or "rubber stamp" theory), an employer who acts without discriminatory intent can be liable for a subordinate's discriminatory animus if the employer uncritically relies on the biased subordinate's reports and recommendations in deciding to take adverse employment action. See E.E.O.C. v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 484–85 (10th Cir. 2006). According to Thomas, Morton possessed retaliatory animus against Thomas as a result of Thomas's opposition to racial discrimination during the Final Warning meeting.

The district court ultimately granted Berry's motion for summary judgment, and Thomas appealed.

## II. Analysis

On appeal, Thomas argues that the district court erroneously granted summary judgment in favor of Berry because, according to Thomas, he presented sufficient circumstantial evidence from which a reasonable jury could conclude that the stated reason for his termination was a pretext for retaliation based on a cat's-paw theory of recovery. We disagree. Reviewing the district court's summary judgment order *de novo* and applying the same standard as the district court, Ward, 772 F.3d at 1202, we conclude that the court properly granted summary judgment in favor of Berry for two reasons, either one of which requires our affirmance.

---

[3] Because Thomas clearly argued that Morton was the retaliatory actor in his response to the district court's Order to Show Cause, we reject Berry's argument that Thomas waived his cat's-paw argument with respect to his retaliation claim.

## A. Legal Framework

A plaintiff can state a valid claim under Title VII or § 1981 by presenting either direct or circumstantial evidence of retaliation.[4] <u>Ward</u>, 772 F.3d at 1202. When a plaintiff presents only circumstantial evidence, the <u>McDonnell Douglas</u>[5] burden-shifting framework typically applies. <u>Id</u>. Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of retaliation by demonstrating that (1) he or she engaged in a protected activity, (2) he or she suffered a material adverse action, and (3) there was a causal connection between the protected activity and the adverse action. See <u>Crowe v. ADT Sec. Servs., Inc.</u>, 649 F.3d 1189, 1195 (10th Cir. 2011). The burden then shifts to the employer to articulate a legitimate non-retaliatory reason for taking the adverse employment action before ultimately shifting back to the plaintiff to establish that the employer's explanation is pretextual—i.e., unworthy of belief. See <u>id.</u> at 1196.

Although the parties disagree about whether Thomas established a *prima facie* case of retaliation—the first step of the <u>McDonnell-Douglas</u> framework—we focus our analysis on whether Thomas established pretext—the last step of the framework. Because we conclude that Thomas failed to meet his burden of establishing that Berry's explanation for terminating his employment was pretextual, we need not separately consider whether Thomas established a *prima facie* case of retaliation.

---

[4] Because "the showing required to establish retaliation is identical under § 1981 and Title VII," <u>see</u> <u>Twigg v. Hawker Beechcraft Corp.</u>, 659 F.3d 987, 998 (10th Cir. 2011) (internal quotation marks omitted), we do not distinguish between these bases for recovery here.

[5] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

Where, as here, the plaintiff lacks evidence that the actual decisionmaker possessed an unlawful retaliatory animus, the plaintiff can establish pretext by invoking the cat's-paw theory of recovery and presenting evidence that a biased subordinate who lacked decisionmaking power used the formal decisionmaker as a dupe in a deliberate scheme to bring about an adverse employment action. See BCI Coca-Cola, 450 F.3d at 484–85. To survive summary judgment when a retaliation claim is based on the cat's-paw theory, the plaintiff must establish that there is a genuine issue of material fact as to (1) the retaliatory animus of the subordinate, and (2) whether the subordinate's animus translated into retaliatory actions that caused the decisionmaker to take adverse employment action. See id. at 488; Simmons v. Sykes Enters., Inc., 647 F.3d 943, 950 (10th Cir. 2011).

### B. Animus

Because Thomas's retaliation claim was based on a cat's-paw theory, Thomas needed to establish a genuine issue of material fact as to Morton's retaliatory animus in order to survive summary judgment. On appeal, Thomas argues that he made this showing because a reasonable jury could infer that Morton possessed retaliatory animus based on two pieces of circumstantial evidence.

First, Thomas argues that a reasonable jury could find that Morton possessed retaliatory animus because his report regarding the September 10 print-quality issue—the incident triggering Thomas's termination—was dishonest as to a material fact. Cf. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (explaining that pretext can be inferred from the falsity of an employer's explanation

7

for taking an adverse action).  According to Thomas, Morton's report—which indicated that Thomas's press was missing a tagline for fifty-eight minutes—was dishonest because it did not also indicate that Thomas had properly inspected the product before going on his one-hour break.

We conclude that a reasonable jury could not infer from this evidence that Morton was acting with retaliatory animus.  Thomas does not argue that the actual content Morton included in his report was dishonest or false; rather, Thomas maintains that Morton's report was dishonest by omission in the sense that Morton did not mention Thomas had properly inspected the product before taking his break. Importantly, however, Thomas does not argue, and nothing in the record suggests, that Berry does not hold Printing Technicians like Thomas responsible for errors that occur while they are on break.[6]  Absent any reason to think that Printing Technicians are *not* responsible for print-quality issues that occur during their breaks, the omission from Morton's report more likely reflects the irrelevance of the omitted information than retaliatory animus.

Second, Thomas argues that a reasonable jury could find that Morton possessed retaliatory animus because his report regarding Thomas's September 10 print-quality issue was inconsistent with Morton's rescission regarding Thomas's earlier July 27 performance problem.  Cf. Trujillo v. PacifiCorp, 524 F.3d 1149, 1158 (10th Cir. 2008) (explaining that pretext can be shown by "weaknesses,

_____

[6] Indeed, there is evidence in the record suggesting just the opposite.  See Suppl. App. at 26 (indicating that "ultimately the quality of the product coming off the press rests with [the Printing Technician]").

implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation for taking an adverse action). The crux of this "inconsistency," according to Thomas, is that Morton relied on exculpatory evidence in rescinding the July 27 performance problem, but Morton did not even mention exculpatory evidence (i.e., that Thomas had properly inspected the product before going on break) in reporting the September 10 print-quality issue.

Again, we conclude that a reasonable jury could not infer from this evidence that Morton was acting with retaliatory animus. As an initial matter, there is nothing intrinsically inconsistent about including less information when initially reporting a disciplinary problem than when subsequently rescinding a disciplinary action upon further investigation. Moreover, the timing of these reports in relation to Thomas's single complaint about race discrimination further negates an inference of retaliatory animus.[7] Morton issued *both* the rescission for the July 27 performance problem and the report for the September 10 print-quality issue *after* Thomas complained about race discrimination. The rescission—issued just days after Thomas complained about racial discrimination—undoubtedly benefited Thomas by absolving him of responsibility for the July 27 performance problem. Because there is no evidence suggesting that Morton's retaliatory animus was somehow inflamed after he issued the rescission but before he issued the report for the September 10 print-quality issue,

---

[7] At earlier stages in this litigation, Thomas indicated that he complained about racial discrimination on multiple occasions. However, because Morton was not privy to all of those complaints, on appeal Thomas relies exclusively on the complaint he made in Morton's presence during the Final Warning meeting.

9

a reasonable jury could not infer that Morton was acting with retaliatory animus with respect to just one, but not both, of his post-complaint reports.

Because no reasonable jury could infer from Thomas's proffered circumstantial evidence that Morton possessed retaliatory animus, we could affirm the district court's summary-judgment order on this basis alone.

### C. Causation

However, even if we assume that Thomas established a genuine issue of material fact as to Morton's retaliatory animus, Thomas's retaliation claim cannot survive summary judgment for yet another reason—he did not produce sufficient evidence from which a jury could infer that Morton's animus was a "but-for" cause of Thomas's termination.[8] It is well-established in this Circuit that an employer can "break the causal chain" between the biased subordinate's unlawful actions and the adverse employment action by independently investigating the allegations against the employee. Young v. Dillon Cos., Inc., 468 F.3d 1243, 1253 (10th Cir. 2006).

---

[8] To establish causation where, as here, a Title VII retaliation claim is based on the cat's-paw theory, a plaintiff must demonstrate that the biased subordinate was a "but-for" cause of the adverse action. Cf. Simmons, 647 F.3d at 949–50 (holding that, because the ADEA requires a "but-for" link between the discriminatory animus and the adverse action, "an ADEA plaintiff seeking to hold an employer liable through the discriminatory conduct of its subordinate must show the subordinate's animus was a 'but-for' cause of the adverse employment action, i.e. it was the factor that made a difference"); Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2532–34 (2013) (holding that Title VII retaliation claims, like ADEA claims, require proof that the desire to retaliate was a "but-for" cause of the adverse action). Although we have not yet explicitly extended Simmons to Title VII retaliation claims that are based on the cat's-paw theory, we conclude that reading Simmons in conjunction with the Supreme Court's subsequent decision in Nassar calls for such an extension. See Goodsite v. Norfolk S. Ry. Co., 573 F. App'x 572, 585 n.7 (6th Cir. 2014) (unpublished) (reaching the same conclusion).

Indeed, we have held that simply asking an employee for his or her version of events may defeat the inference that an employment decision was discriminatory, as such an inquiry demonstrates that "the employer has taken care not to rely exclusively on the say-so of the biased subordinate." BCI Coca-Cola, 450 F.3d at 488; see also Pinkerton v. Colorado Dep't of Transp., 563 F.3d 1052, 1061 (10th Cir. 2009) (suggesting that an employer's request that an employee give her side of the story "is sufficient to defeat any inference that the decision was based on a subordinate's bias").

Here, as part of Berry's termination review process, a Termination Review Panel reviewed and affirmed Thomas's termination. The Panel, which was comprised of two independent Berry managers, undertook its review within two days of Thomas's termination. In addition to reviewing Thomas's entire disciplinary history—which included information not only from Morton but also from seven other supervisors who had disciplined Thomas—the Panel interviewed Thomas and gave him an opportunity to share his side of the story.

We conclude that Berry's independent termination review process broke the causal chain between Morton's purported retaliatory animus and Thomas's termination. Thomas does not argue, and there is no evidence to suggest, that the Panel's review was a sham, that the Panel failed to adhere to Berry's termination-review policy, that the review policy was itself flawed, or that anyone on the Panel

11

acted with animus.[9]  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1231 (10th Cir. 2000) (concluding that plaintiff's claim based on the cat's-paw theory failed and emphasizing that plaintiff did not offer any evidence showing that the decisionmaker's independent investigation was a sham); Macon v. United Parcel Serv., Inc., 743 F.3d 708, 715 (10th Cir. 2014) (concluding that plaintiff's claim based on the cat's-paw theory failed and emphasizing that the grievance review panel acted in accordance with the company's written policies in independently assessing plaintiff's alleged misconduct and that plaintiff did not allege the panel was itself biased, had retaliatory motive, or merely rubber-stamped the termination decision). Although we have typically found causation lacking when an employer's independent investigation was initiated *before* the adverse action,[10] we hold here that Berry's virtually immediate post-termination review process—which was designed to identify and unwind termination decisions that violated company practices and policies— sufficiently constrained any retaliatory animus that Morton may have possessed.  Cf. Macon, 743 F.3d at 711–12, 715 (explaining that although an allegedly biased

---

[9] Thomas nonetheless maintains that the Panel was not truly independent because the Panel (1) failed to interview two witnesses Thomas identified, and (2) relied on information that flowed from Morton.  Both of these arguments fail.  First, Berry's termination-review policy makes clear that the Panel is not required to interview witnesses.  See Suppl. App. at 25 (explaining that the Panel "may or may not need to contact additional people" after interviewing the terminated employee).  Second, although the Panel did discuss the events leading up to Thomas's termination with Morton, the Panel verified that termination was justified based on other sources.  See Suppl. App. at 27 (affirming Thomas's termination based on, *inter alia*, discussions with Jeff Wilks, another one of Thomas's direct supervisors).

[10] See e.g., Kendrick, 220 F.3d at 1231; Pinkerton, 563 F.3d at 1061; Simmons, 647 F.3d at 950; Lobato v. N.M. Env't Dep't, 733 F.3d 1283, 1296 (10th Cir. 2013).

subordinate started the process leading to plaintiff's termination, plaintiff's invocation of the company's grievance procedure "triggered a review process which appropriately constrained any improper motive").

Because Thomas did not proffer sufficient evidence from which a jury could infer that Morton's animus was a but-for cause of Thomas's termination, Thomas's retaliation claim cannot survive summary judgment even if we assume that there is a genuine issue of material fact as to Morton's animus.

## III. Conclusion

For these reasons, we AFFIRM the district court's order granting summary judgment in favor of Berry.