FILED
United States Court of Appeals
Tenth Circuit

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**January 14, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

SONDIA BELL,

     Plaintiff - Appellant,

v.

CITY OF TULSA,

     Defendant - Appellee.

No. 23-5111
(D.C. No. 4:21-CV-00061-JB-CDL)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.
_____

Sondia Bell worked for the City of Tulsa's Information and Technology (IT) department. Across twelve months, the City twice suspended her without pay and then it fired her. She sued, alleging that the City's actions were discriminatory and retaliatory. The City moved for summary judgment, arguing that it suspended and fired her because she repeatedly violated work policies— not for any unlawful reason. The district court granted the City's motion after

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

concluding that Bell failed to raise a genuine dispute of material fact that the City's legitimate reasons for its employment actions were pretext for discrimination or retaliation. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I.    Factual Background[1]

In 2014, Sondia Bell, an African American woman, began work for the City. Two years later, she was promoted to be a Senior IT Business Support Administrator. Within the IT department, Bell reported to Chris Berg, an IT Manager. And Berg, in turn, reported to Michael Dellinger, IT's department head.

In 2019, Bell's relationship with Berg began to sour. About that time, Bell struggled to balance her work life with the care of her son, who has autism. To alleviate the pressure, she asked Berg if she could permanently work from home. Berg denied Bell's request on grounds that allowing anyone to full-time telework would prevent his department's ability "to adequately cover

---

[1] We provide the facts in the light most favorable to Bell as the non-moving party. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1285 (10th Cir. 2018). But that does not mean we consider only Bell's factual assertions. At summary judgment, she must support her factual assertions by "citing to particular parts of materials in the record" or by showing that the opposing party's admissible evidence did not raise a genuine dispute of fact. Fed. R. Civ. P. 56(c). Where Bell "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," we "consider the fact undisputed for purposes of the motion." *Id.* at 56(e).

all of the essential services [it] provide[s]," which "require daily on-site presence." App. vol. I, at 148.

Bell appealed Berg's decision to Dellinger. Dellinger told Bell that the work-from-home decision fell to Berg as her direct supervisor. Two weeks later, Bell filed a grievance alleging that Berg denied her request "even though there are other IT employees who work from home." App. vol. III, at 642. Dellinger fielded the grievance and upheld Berg's decision, noting that Berg did not allow anybody in his division to work from home.[2]

Bell's rejected telework request marks the starting point for a series of employment actions ending in her termination seventeen months later. In December 2019, Dellinger suspended Bell without pay for five days. In September 2020, Dellinger suspended her without pay for ten days. And in December 2020, he fired her.

## A.    First Disciplinary Hearing & Suspension

One of Bell's coworkers, Summer Caughron, had a bathroom inside her single-person office.[3] For a time, Bell used the bathroom in Caughron's office.

---

[2] Bell references two IT employees who were allowed to work from home: Jan Buster and Paula Stickelber. But they held different jobs, in different divisions, under different supervisors. Berg was not involved in the decision to allow them to work from home and he says that he did not let anyone work from home. Bell stated in her deposition that she does not know of anyone under Berg's supervision who was allowed to work from home.

[3] Berg's division was run out of an old, converted school building. Caughron's office used to be the school's nursing office, which had an internal

(*footnote continued*)

3

Bell's children used it too when she brought them to work. According to Caughron, Bell's kids would make a mess out of the bathroom and often lock Caughron out of her office. For that reason, Caughron says she started locking her office door, which prevented Bell from using the inside bathroom.

On September 4, 2019, Bell and Caughron argued about the locked door. Coworkers overheard the argument and reported it to Berg, who asked for statements from everyone involved. He received statements from all witnesses but Bell. Later that day, Berg emailed Bell and told her that a policy for restrooms "located within a single-occupancy office[] will need to be developed," but until then "use by anyone of the restroom in [Caughron's] office is suspended until further notice." App. vol. II, at 343.

After the argument, Bell and Caughron filed complaints against each other, and Human Resources (HR) began investigating. Over the next week, HR Manager Joyce Powell twice asked Bell to provide a written statement about the argument. Bell did not provide one. During its investigation, HR heard that Bell had recorded the argument. Powell repeatedly asked Bell for the audio recording. Bell responded that she would give Powell the audio recording, but not before HR gave her Caughron's written statement about their

---

single-person bathroom. The building also had a public restroom down the hall from Caughron and Bell's offices.

argument. HR refused to release Caughron's statement while the investigation pended. And Bell refused to produce the recording.[4]

On September 23, 2019, Bell filed a discrimination complaint against Berg for "unfavorable job assignments and creating a hostile work environment with a public bathroom." App. vol. III, at 703–04. She also complained that Powell treated her condescendingly during the bathroom investigation. A week later, Bell emailed Powell, Dellinger, and the Mayor, among others. Her email claimed that she was the only person excluded from Caughron's bathroom. In support, she quoted from Berg's email about creating a new bathroom policy, but she altered Berg's quote to imply that everybody but her could use the bathroom.[5]

About a month later, Berg initiated a disciplinary, pretermination hearing against Bell. In the hearing notice, Berg asserted that Bell had dishonestly altered his email to make it look like she was receiving unequal treatment. He

---

[4] At her deposition, Bell stated that she could not produce the recording for litigation purposes because she had lost it.

[5] Berg's original email stated: "A policy regarding use of restrooms, located within a single-occupancy office, will need to be developed. As such, until that time, *use by anyone of the restroom in [Caughron's] office is suspended until further notice*." App. vol. II, at 343 (emphasis added).

Bell's misquoted email stated: "A policy regarding use of restrooms, located within a single-occupancy office, will need to be developed. As such, until that time, *should be able to be used by anyone.* The restroom in [Caughron's] office is suspended until further notice." *Id.* at 342 (emphasis added).

5

also asserted that she had impeded HR's investigation into the bathroom argument, that she had ignored his emails and directives, and that she had often been absent from work since July.

Clayton Edwards, the Director of the Water and Sewer Department, oversaw Bell's disciplinary hearing. As hearing officer, Edwards was to receive evidence and make a non-binding recommendation "as to whether, based on that evidence, the employee violated City policies or work rules." *Id.* at 466. Edwards knew nothing about Bell before the hearing.

After the hearing, and "[b]ased on the information presented and the testimony given," Edwards found that Bell had violated the City's honesty and respect-for-authority work rules.[6] App. vol. II, at 425 (noting the "seriousness of [] Bell's actions, including numerous examples of impeding an investigation and not following her supervisor's directives"). He recommended that Dellinger suspend Bell without pay for five days and assign her a different supervisor. On December 11, 2019, Dellinger suspended Bell without pay for five days, but he kept Berg as her supervisor. After her suspension, Berg provided Bell a letter

---

[6] The City's honesty work rule prohibits "[f]alsifying any written or electronic report, or document arising from or related to employment or work with the City" as well as "[m]aking false or untrue statements regarding work-related matters." App. vol. IV, at 741. The respect-for-authority work rule prohibits "impeding" investigations and "flagrant[ly] disregard[ing]" supervisory directives. *Id.* at 743.

clarifying what he expected from her and explaining that she could follow the grievance procedure if she ever disagreed with his decisions.

Bell appealed her suspension to the City's Civil Service Commission, a body comprised of five non-employee citizens charged with reviewing the City's employment decisions. Under the Commission's mandate, "[n]o suspension, removal, or demotion shall be affirmed unless sustained by a preponderance of the evidence" reflecting "good and sufficient cause" for the employment action. *Id.* at 432–33. The burden of proof is on the decisionmakers to justify the adverse action. If, after a hearing, the Commission finds that a disciplinary action lacks adequate cause, "the position of the employee shall be restored without loss of pay." *Id*. at 433. If the Commission finds adequate cause, it may affirm or modify the employment action.

On March 12, 2020, Bell appeared before the Commission with her attorney. After hearing evidence and testimony from both parties, the Commission found by unanimous vote "that the City had just cause to discipline [Bell]." App. vol. III, at 435–36.

### B.    Second Disciplinary Hearing & Suspension

On March 13, 2020, Berg and Bell exchanged over a dozen emails about a disagreement on how to tabulate leave time and overtime. About halfway through the exchange, Berg told Bell to "file a grievance" if she disagreed with his instructions, but that she needed to follow them. *Id.* at 438. Ultimately, Bell

7

refused to follow Berg's repeated instructions and she claimed unauthorized time.

On June 8, 2020, at about seven a.m., Bell told Berg that she would be late to work. She arrived after one p.m. At 4:45 p.m. that day, Berg directed her to clock out because her shift had ended. She did not. At 5:07 p.m., Berg asked her why she had not left yet, and he again told her to leave. Bell left at 5:20 p.m.

Based on those two events, Berg launched a second disciplinary hearing against Bell. In the hearing notice, he asserted that she had refused to obey work directions, violating the respect-for-authority work rule. The City held Bell's second hearing on August 31, 2020. Again, Edwards served as the hearing officer. Again, based on the evidence presented to him, he concluded that Bell had violated the respect-for-authority work rule. This time, though, he recommended that Dellinger fire Bell.

But Dellinger decided not to fire her. Rather, he suspended her without pay for ten days. Dellinger sent Bell a letter reiterating what is expected from her and cautioning her that she could be terminated if she again violated a work policy. Apparently, Bell did not appeal her second suspension to the City's Civil Service Commission.

### C.    Third Disciplinary Hearing & Termination

In July 2020, Bell asked for additional leave time under the Family and Medical Leave Act (FMLA). According to Bell, HR over-scrutinized her

8

request and did not timely approve it. On September 25, 2020, Powell and another HR manager teleconferenced with Bell to discuss her FMLA request. Powell recorded the call with Bell's consent.[7]

Halfway into the hour-long conversation, Bell told Powell that she was not going to answer certain questions about her leave application unless the questions were put in writing. For example, Bell refused to tell Powell whether her son would be attending virtual school full-time—something Powell said she needed to know to process Bell's leave request. The conversation devolved from there, with Bell making statements like, "I am not going to stop until I am in the grave to make sure that I let [it] be known how the City of Tulsa and namely Joyce [Powell] bullied her employees . . . ." *Id.* at 500. Throughout the call, Powell never discussed, or purported to know, Bell's son's level of autism.

On October 12, 2020, Bell emailed Powell, Dellinger, and the Mayor, among others. She accused HR's FMLA team of not providing her the leave time to which she was entitled. She also accused Powell of racially discriminating against her, retaliating against her, and violating health-care privacy laws by knowing her son's level of autism. Relevantly, Bell wrote:

> I was told by Joyce Powell via a recorded telephone call on 9/25/2020, my child is level 3. Joyce then explained to me the

---

[7] On appeal, Bell did not submit an electronic or hard-copy version of the call recording. But her appendix includes a transcript of the recording. She cites that transcript for factual propositions, and she does not dispute that it accurately represents the call. So we find that the statements in the transcript are undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).

definition of a Level 3 . . . . I found this to be yet another violation of the HIPAA Laws . . . . How does Joyce Powell know what level my child is on?

*Id.* at 716. In a response email, Powell notified Bell that she referred Bell to disciplinary review for falsely representing what happened on the call, and for using those false misrepresentations to accuse Powell of violating health-care privacy laws.

A week later, Bell received notice of her third disciplinary hearing. In it, Berg asserted that Bell "behave[d] in an unprofessional, disrespectful, condescending, and threatening manner with Human Resources management and staff." *Id.* at 471. He also asserted that Bell made "false and unsubstantiated claims" in her October email. *Id.* The City held Bell's third disciplinary hearing on December 2, 2020.

Again, Edwards served as the hearing officer. After hearing evidence and testimony, he found that Bell had violated the City's work rules requiring honesty, courtesy, and respect for authority. For the second time, he recommended that the City terminate her employment. This time, Dellinger agreed. He fired Bell on grounds that she had repeatedly violated the City's work rules and "continue[d] to behave in an unprofessional, disrespectful, condescending, and threatening manner . . . ." *Id.* at 508.

On February 11, 2021, helped by her union president, Bell went before the Civil Service Commission to appeal her termination. After the presentation of evidence from both parties, the Commission unanimously found that the City

had carried its burden of persuasion and shown just cause to terminate Bell.

Five days later, Bell filed this lawsuit.

## II.    Procedural Background

Bell sued the City in federal court. She alleged that the City mistreated
and terminated her "*because* she was black, had a child with special needs, and
stood up for her employment civil rights." App. vol. I, at 12. Simple as that
seems, her theories of discrimination and retaliation have evolved during this
litigation. To help chart that evolution, we break the procedural background
into three parts: (A) Bell's complaint, (B) summary judgment, and (C) the
appeal.

### A.    Bell's Complaint

Bell's complaint included six claims, asserting: race discrimination and
retaliation under section 1981 of the Civil Rights Act of 1866, 42 U.S.C.
§ 1981; race discrimination and retaliation under Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000e *et seq.*; and association discrimination and
retaliation under the Americans with Disabilities Act (ADA), as amended by
the American with Disabilities Act Amendments Act (ADAAA), 42 U.S.C.
§§ 12101–12205. App. vol. I, at 14–15.

One note about Bell's ADA association-discrimination claim: though the
complaint mentions in a background paragraph that she was terminated because
she has a child with special needs, the ADA association-discrimination claim

itself alleges only that the City denied her work-from-home requests because of her association with her child.

B.     **Summary Judgment**

The City moved for summary judgment on grounds that Bell failed to show that she was suspended or fired because of an unlawful motive. The City also argued that Bell's ADA association-discrimination claim failed for lack of an adverse employment action because she based that claim on the "denial of her work from home request," not her termination. *Id.* at 57.

In response, Bell asserted that her ADA association-discrimination claim alleged that she was *terminated* because of her association with her son. The City replied, contending (1) that Bell did not plead an association-discrimination claim based on her termination and (2) that even if she had, she presented insufficient evidence to show that her son's disability motivated her termination.

At a hearing on the motion, the City noted that the briefing discussed "Bell's request to telecommute," and "whether or not she was allowed to use [Caughron's] bathroom . . . ." App. vol. IV, at 780. The City argued that those decisions were not viable adverse employment actions that could support Bell's claims. Responding to that point, Bell clarified that her claims were based on the "[f]ive-day suspension, ten-day suspension . . . and the termination," not the other "miniscule things," like telework and bathroom availability. *Id.* at 810.

12

After the hearing, the district court granted the City's motion for summary judgment. *Bell v. City of Tulsa*, No. 4:21-CV-00061-JB-CDL, 2024 WL 1018528, at *1 (N.D. Okla. Mar. 8, 2024). In its ruling, the district court considered only Bell's suspensions and terminations as adverse actions, not denied work-from-home requests or anything else. *See id.* at *29, *40, *48 & n.109, *49, *55. The district court also construed the City's motion for summary judgment as targeting an ADA association-discrimination claim based on Bell's termination. *Id.* at *55 n.114.

As for each of Bell's claims alleging wrongful suspension and termination, the district court concluded that Bell failed to establish that the City's legitimate reasons for the actions were pretextual. *Id.* at *40, *49, *58. The court entered its judgment and closed the case.

## C.    Appeal

On appeal, Bell names three issues: (1) whether the district court improperly struck her ADA association-discrimination claim based on her termination because the City did not move for summary judgment on that claim; (2) whether the district court properly considered her ADA association-discrimination claim; and (3) whether genuine disputes of material fact precluded summary judgment for all her claims. Though she discusses the merits of her claims collectively—making it difficult to pin down her arguments—she discusses at length her denied work-from-home requests. She

13

also asserts that the pretermination hearing notices she received were adverse actions.

The City argues (1) that the district court properly ruled on the ADA association-discrimination claim; (2) that neither the pretermination hearing notices nor the denied work-from-home requests were adverse actions; and (3) that the district court rightly concluded that Bell failed to raise a genuine dispute of material fact on whether the City's legitimate reasons for suspending and terminating her were pretextual. Bell did not reply.

## STANDARD OF REVIEW

We review de novo the grant of summary judgment, applying the same standards as the district court. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). "In doing so, we consider the evidence in the light most favorable to the non-moving party." *Id.* (internal quotation marks omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## DISCUSSION

This appeal presents three types of issues: (I) an alleged procedural error at summary judgment; (II) the proper framing of Bell's claims; and (III) the merits of her claims. We first explain the procedural posture of the City's motion. Then we clarify the claims before us on appeal. And finally, we address the merits of those claims, affirming the summary-judgment grant for the

14

claims because Bell failed to raise a genuine dispute of material fact that the City's legitimate reasons for suspending and terminating her were pretextual.

## I. Alleged Procedural Error at Summary Judgment

Bell contends that the City did not move for summary judgment on her ADA association-discrimination claim, in which she alleged that the City terminated her because of her son's disability. So, according to Bell, the district court procedurally erred by granting the City summary judgment on that unmoved-for claim. We disagree.

The City moved for summary judgment on Bell's ADA claim for "disability association discrimination." App. vol. I, at 56 (internal quotation marks omitted). Though the motion did not explicitly target Bell's *termination* under the ADA, that was because the complaint's claim for association discrimination did not cite her termination as an adverse action. When Bell clarified in her response that her ADA association-discrimination claim was based on her termination, the City likewise clarified that its motion for summary judgment included that discriminatory-termination claim. Faced with those developments, the district court's summary judgment order noted that Bell's complaint "is somewhat ambiguous as to the nature of [her] ADA claim." *Bell*, 2024 WL 1018528, at *55 n.114. Despite the ambiguity, the district court construed Bell's summary-judgment response as amending her ADA claim. *Id.* Thus, the district court reviewed Bell's "ADA association claim as presented in her response," which included the theory that the City terminated her because

15

she has a child with a disability. *Id.* In doing so, the district court implicitly construed the City's reply as targeting Bell's amended association-discrimination claim.

Bell does not provide that full procedural background on appeal. And she fails to explain how the district court erred in its summary-judgment approach to her evolving ADA theory. Without adequate briefing, we decline to find a procedural error in the district court's resolution of the ADA association-discrimination claim. *See Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").

## II.    Framing Bell's Claims

Before deciding whether Bell raised a genuine dispute of material fact precluding summary judgment on her discrimination and retaliation claims, we must clarify what those claims are—namely, what employment actions does she assert were discriminatory or retaliatory? Bell provides little help there because she collectively analyzes her claims, drawing no distinction among the decisionmakers, protected conduct, and employment actions. Even so, Bell clearly contends that the City suspended and terminated her for discriminatory and retaliatory reasons. But, along with her suspensions and termination, Bell mentions two other types of employment actions.

First, Bell extensively discusses her denied work-from-home requests. (asserting Berg "unlawfully denied" her work-from-home requests). Despite

16

asserting that her requests were wrongly denied, Bell does not challenge the district court's view that she did not base her claims on her denied work-from-home requests. *See Bell*, 2024 WL 1018528, at *29 (noting that Bell based her claims on "her suspensions and termination," not "the other incidents that are in this case" (internal quotation marks omitted)). More too, Bell fails to argue that, or explain why, a denied work-from-home request is an adverse action. So she waived that claim to the extent that it was raised. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

Second, she argues that the City's disciplinary-hearing *notices* were adverse actions. *See* Op. Br. at 18–19 ("The Pre-Termination Notice constitutes an adverse action as it is a written warning that effects a significant change in [] employment status, that is, termination."). Contrary to Bell's argument, the disciplinary-hearing notices benefited Bell. They informed her of due-process hearings where she could dispute misconduct allegations against her, and they gave her time to prepare and lodge her cases that the allegations were false and discriminatory. The notices themselves were not a "harm respecting an identifiable term or condition of employment," *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 354–55 (2024), nor would they "dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington N. &*

17

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). So the City's disciplinary-hearing notices were not adverse employment actions.

For these reasons, we consider only Bell's claims that the City unlawfully suspended and terminated her. Any other purported adverse action either did not harm Bell or she waived it. We do, though, consider the other cited employment decisions as potentially relevant circumstantial evidence for whether the City unlawfully suspended or terminated her.

## III.    Discrimination & Retaliation Merits

As stated, Bell brought discrimination and retaliation claims under Title VII, § 1981, and the ADA. Collectively, she asserts that the City suspended and terminated her because she is African American (race discrimination under Title VII and § 1981), because she engaged in protected activity (retaliation under all three statutes), and because she has a child with a disability (ADA association discrimination).

A plaintiff can succeed under Title VII, § 1981, and the ADA by presenting direct and circumstantial evidence of discrimination or retaliation. When a plaintiff relies on only circumstantial evidence, as here, the *McDonnell Douglas* burden-shifting framework typically applies.[8] *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 340 (2020) ("*McDonnell*

---

[8] Bell acknowledges that her claims "rel[y] on indirect evidence and the inferences favorably drawn therefrom to defeat summary judgment." Op. Br. at 22.

*Douglas* sought only to supply a tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination.").

The district court applied the *McDonnell Douglas* burden-shifting framework to all of Bell's claims. *Bell*, 2024 WL 1018528, at *35–36. Bell does not challenge that approach and she uses the burden-shifting framework for her Title VII, § 1981, and ADA claims.[9] So we use it too. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018) (analyzing ADA retaliation claim under *McDonnell Douglas*); *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 968–69 (10th Cir. 2017) (same for ADA association-discrimination claim); *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015) (same for Title VII and § 1981 retaliation claims); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 & n.4 (10th Cir. 2000) (same for Title VII and § 1981 race-discrimination claims).

We summarize the legal framework and then apply it to Bell's evidence.

### A.    Burden-Shifting Framework

The *McDonnell Douglas* burden-shifting framework has three steps. For the first step, the plaintiff has the initial burden of establishing a prima facie

---

[9] In her second issue heading, Bell states that the district court "failed to properly consider" her ADA association-discrimination claim. Op. Br. at 13. Though that might sound like she challenges the legal standard used by the district court, she asserts that the district court failed to properly consider her ADA claim because she raised a genuine dispute of material fact at each *McDonnell Douglas* step.

case of discrimination or retaliation. *See Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019) (discrimination); *Thomas*, 803 F.3d at 514–15 (retaliation). The "specific test for a prima facie case may vary" depending on the context, statute, and theory. *Singh*, 936 F.3d at 1037. In general, though, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination [or unlawful retaliation]." *Kendrick*, 220 F.3d at 1227, 1234 (internal quotation marks omitted).

If the plaintiff makes a prima facie case, the burden of production shifts to the employer to assert a legitimate, nondiscriminatory, and nonretaliatory reason for its actions. *DePaula*, 859 F.3d at 970. "This stage of the analysis only requires the defendant to articulate a reason for the discipline that is not, on its face, prohibited and that is reasonably specific and clear." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (cleaned up). To do so, the defendant must provide admissible evidence of a "legally sufficient explanation" for the employment action. *DePaula*, 859 F.3d at 970 (internal quotation marks omitted). An employee's violation of a legitimate employer policy can constitute a legally sufficient reason for taking an employment action. *See Frappied*, 966 F.3d at 1058 (holding that "violations of company policy," "attendance issues," and "performance mistakes" can be legitimate justifications for employee discipline).

20

If the employer meets its burden at the second *McDonnell Douglas* step, the burden shifts back to the plaintiff at the third step to identify evidence showing that the employer's legitimate explanations for the employment actions were "pretextual—i.e., unworthy of belief." *Thomas*, 803 F.3d at 514 (discussing pretext under Title VII and § 1981); *see also Tesone*, 942 F.3d at 995 (discussing pretext under the ADA). At this step, the plaintiff need not show that the employer's "reasons were a pretext *and* that the real reason was [unlawful]—the fact of pretext alone may allow the inference of [unlawfulness]." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135–36 (10th Cir. 2003).

A plaintiff may show pretext in any number of ways, including by demonstrating that the "proffered reason is factually false." *DePaula*, 859 F.3d at 970 (internal quotation marks omitted). This is often accomplished "by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (internal quotation marks omitted). A plaintiff may also show pretext by demonstrating that "the defendant acted contrary to a written company policy," an unwritten company policy, or a company practice "when making the adverse employment decision affecting the plaintiff." *Kendrick*, 220 F.3d at 1230. And, classically, a plaintiff can show pretext by pointing to evidence of better treatment toward

21

employees of nonprotected status who engaged in similar conduct as the plaintiff. *Id.* at 1232.

We consider all evidence suggesting pretext, including any evidence used for the plaintiff's prima facie case, but we do not "second guess the business judgment of the employer." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (internal quotation marks omitted). "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*, and do not look to the plaintiff's subjective evaluation of the situation." *DePaula*, 859 F.3d at 971 (internal quotation marks omitted). And though the focus is on the decisionmaker, a plaintiff can also establish pretext by showing that a biased subordinate's actions caused the employment decision, even if the decisionmaker were not biased. *Thomas*, 803 F.3d at 514–15; *see EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484–88 (10th Cir. 2006) (discussing the various subordinate-bias theories).

## B.    Analysis

We assume for argument's sake that Bell has made prima facie showings at the first *McDonnell Douglas* step that the City suspended and terminated her (1) because of her race under Title VII and § 1981;[10] (2) because she engaged in

---

[10] A plaintiff makes a prima facie case for wrongful discharge under Title VII and § 1981 by showing that "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was

(*footnote continued*)

protected activity under Title VII, § 1981, and the ADA;[11] and (3) because of

her association with her child's disability under the ADA.[12] So we begin at

*McDonnell Douglas*'s second and third steps. We consider the City's proffered

reasons for each employment action and whether Bell provided sufficient

---

discharged; and (4) the job was not eliminated after his discharge." *Kendrick*, 220 F.3d at 1229; *see also id.* at 1226 n.4 (holding that race discrimination under Title VII and § 1981 have the same prima facie case under *McDonnell Douglas*). Though sharing a prima facie case under *McDonnell Douglas*, Title VII plaintiffs can prove status-based discrimination under a "lessened" motivating-factor causation standard, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013), while § 1981 requires "but-for" causation, *Comcast Corp.*, 589 U.S. at 333. Here, we conclude that Bell fails to show that her race motivated her suspensions and termination, which disposes her Title VII claim. And given the higher but-for causation standard, her § 1981 claim also fails.

[11] A plaintiff makes a prima facie case of retaliation under Title VII and § 1981 by showing that "(1) he or she engaged in a protected activity, (2) he or she suffered a material adverse action, and (3) there was a causal connection between the protected activity and the adverse action." *Thomas*, 803 F.3d at 514; *see also id.* 514 n.4 & 516 n.8 (holding that Title VII and § 1981 have the same causation standard for retaliation). Similarly, to make a prima facie case of ADA retaliation, a plaintiff must demonstrate that "(1) [she] engaged in protected opposition to discrimination; (2) a reasonable employee would have found [her] employer's subsequent action to be materially adverse; and (3) a causal connection exists between [her] protected activity and the employer's action." *Lincoln*, 900 F.3d at 1209 (cleaned up).

[12] A prima facie case for association discrimination under the ADA requires: "(1) the plaintiff was 'qualified' for the job at the time of the adverse employment action; (2) the plaintiff was subjected to adverse employment action; (3) the plaintiff was known by [her] employer at the time to have a relative or associate with a disability; [and] (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1154 (10th Cir. 2008) (quoting *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997)).

evidence to raise a genuine dispute of material fact that those reasons were pretextual justifications for discrimination or retaliation.

### 1. First Suspension

The district court concluded that Bell did not provide enough pretext evidence to undermine the City's proffered reasons for suspending her in 2019. *Bell*, 2024 WL 1018528, at *46. We agree.

In an email complaining about not having access to a bathroom in a coworker's office, Bell materially misquoted her supervisor to make it look like he excluded only her from the office's bathroom. About that time, Bell also refused to provide HR with a written statement about an argument she had with a coworker. Then, after several nonresponsive emails to HR's questions, she attempted to use her audio-recording of the argument as leverage to get HR to give her the coworker's written statement. Based on that, and other conduct, the City says it suspended Bell for violating its work rules requiring honesty and respect for authority. We find those reasons to be legitimate, nondiscriminatory, and nonretaliatory. So the burden shifts to Bell to show that the City's reasons are pretextual.

Bell attempts to show pretext by arguing that the allegations of dishonesty and disrespect against her were false. But Bell does not dispute that she misquoted her supervisor's email. Nor does she genuinely dispute that she ignored HR's requests for a written statement detailing the argument with her coworker and impeded HR's investigation into that matter. Dellinger

24

considered those facts in his review of the misconduct allegations against Bell and the record shows that he believed the allegations to be true. So Bell's falsity-of-allegations argument fails to cast doubt on the City's proffered reasons for suspending her. *See Kendrick*, 220 F.3d at 1231 (rejecting falsity argument where the undisputed evidence shows that the decisionmaker terminated the plaintiff because he believed the misconduct allegations were true after investigating).

Bell also points to temporal proximity to show pretext. *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (explaining that "temporal proximity between the protected activity and the retaliatory conduct" can contribute to an inference of pretext). She highlights that Berg alleged that she started violating work policy beginning two days after she filed a grievance against him for denying her work-from-home request. Though that fact may be relevant to whether Berg had a retaliatory motive, Berg did not make the decision to suspend her. *See Kendrick*, 220 F.3d at 1231 ("[A] challenge of pretext requires us to look at the facts as they appear to the person making the decision . . . ."). Rather, Dellinger suspended her after a third-party hearing officer found that she had violated work policies requiring truthfulness and respect. And that decision was reviewed by an independent commission of five non-employee citizens, which unanimously found that the City had just cause to suspend her.

Bell points to no evidence indicating that the decisionmaker, the hearing officer, or the independent commission failed to follow procedure or were otherwise animated by unlawful motives while reviewing the misconduct allegations against her. Her temporal proximity evidence against a non-decisionmaker, without evidence of subordinate bias infecting the decision, does not establish pretext. *See Thomas*, 803 F.3d at 514–17 ("[A]n employer can break the causal chain between the biased subordinate's unlawful actions and the adverse employment action by independently investigating the allegations against the employee." (internal quotation marks omitted)). We conclude that Bell has failed to raise a genuine dispute that the City's reasons for suspending her in 2019 were pretextual.

### 2.    Second Suspension

Bell argues that she presented sufficient evidence for a jury to find that the City's reasons for suspending her in 2020 were pretextual justifications for race discrimination, retaliation, and disability-association discrimination. We disagree.

In March 2020, Berg and Bell exchanged over a dozen emails about a disagreement on how to tabulate leave time on her timecard. Ultimately, Bell refused to follow Berg's repeated instructions. In June 2020, Berg twice directed Bell to leave work because she was not authorized overtime. Bell did not leave when directed.

In both instances, Bell believed Berg's approach to timekeeping was wrong. Berg alleged that Bell's refusal to follow his instructions had violated the City's respect-for-authority work rule. The City held a hearing on those allegations. And Dellinger, after receiving the hearing officer's recommendation to terminate Bell, suspended her on grounds that she repeatedly disobeyed reasonable work directives. We conclude that that is a legitimate, nondiscriminatory, and nonretaliatory reason for suspending Bell. So Bell needs to show us sufficient evidence for a jury to disbelieve it. And she failed to make that showing.

To show pretext, Bell argues that Berg brought her up on "unjustified" and "frivolous" misconduct allegations. Op. Br. at 5. In support, Bell asserts that she kept the vacation time because she was entitled to it, and that she clocked-out late because she was making up time for FMLA purposes, which Berg knew. But Dellinger did not purport to suspend Bell for timekeeping errors. Rather, Dellinger told Bell that he was suspending her because she disobeyed reasonable work directives. And for that ground, Bell does not dispute that she did repeatedly disobey Berg's reasonable directives—opting not to lodge her timekeeping concerns through proper grievance channels, despite Berg encouraging her to do so. Because Bell does not dispute that the misconduct allegations were true and that Dellinger believed them to be true, she cannot show pretext based on false misconduct allegations. *Kendrick*, 220 F.3d at 1231.

27

She points us to nothing else showing pretext, and we see none in the record. We conclude that Bell's evidence does not discredit the City's legitimate reasons for suspending her in 2020.

### 3.    Termination

Finally, Bell argues that she raised a genuine dispute of material fact on whether the City fired her because of her race, her protected conduct, and her child's disability. The district court concluded that Bell failed to provide enough evidence for a jury to determine that the City's legitimate reasons for firing her were pretextual. *Bell*, 2024 WL 1018528, at \*54. We agree.

The City asserts that it terminated Bell because she was repeatedly dishonest and disrespectful for over a year. In making its decision, the City says it considered Bell's previous two suspensions, her statements in the October 12th email, and her conduct at the September 25th teleconference. We find the City's reasons for firing Bell to be legitimate, nonretaliatory, and nondiscriminatory. *See Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196–97 (10th Cir. 2011) (finding a history of disciplinary problems and insubordination to be a legitimate reason for termination). Because the City met its burden, Bell needed to point to evidence showing that the City's reasons for terminating her were pretextual. She has not done so.

First, Bell seeks to establish pretext by arguing that her third disciplinary hearing was unjustified and based on trumped-up allegations of dishonesty. But Bell does not dispute that she factually misrepresented what Powell said on the

28

September 25, 2020, call. Bell told her supervisors (and the Mayor, no less) that Powell talked about her son's autism level in violation of health-care privacy laws. Powell, though, never mentioned Bell's son's autism level. The record thus establishes that Bell made false statements to her supervisors about a serious workplace matter. So her falsity-of-allegations argument fails to show pretext.

Second, Bell asserts that the City's reasons for her termination are pretextual because the City's reasons for her previous suspensions were pretextual. Stated otherwise, Bell argues that the City unjustifiably padded her disciplinary record to support her termination. *See* Op. Br. at 30 (citing *Neyman v. United Telecomms., Inc.*, 1 F.3d 1249, 1993 WL 279765, *4 (10th Cir. 1993) (unpublished table opinion) ("An employer's discriminatory conduct in a retaliation setting may be inferred from circumstantial evidence, including attempts to build a record and disguise discriminatory purpose.")). This padding-the-record argument does not work here because Bell failed to show that the two suspensions on her disciplinary record were unjustified.

Finally, Bell tries to show pretext by comparing her treatment to the treatment of her coworkers. For this argument, she highlights no coworkers who were dishonest or disrespectful to supervisors, or who allegedly "violated work rules of comparable seriousness." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). Rather, she uses comparators to show only that Berg treated her unequally by denying her work-from-home privileges (as he

did for everyone) and by banning her from using a bathroom in a coworker's office (as he prohibited everyone from using). So her comparators do not show that she received any unequal treatment or that the City's reasons for terminating her—repeated dishonesty and insubordination—were pretextual. *See Kendrick*, 220 F.3d at 1230 (reiterating that comparators need to have violated work rules of "comparable seriousness" to support an inference of unequal punishment).

For those reasons, Bell's pretext arguments fail. And even if Bell relies on a subordinate-bias theory of liability, her discrimination and retaliation claims fail for another reason: The City independently reviewed the misconduct allegations against her. *Thomas*, 803 F.3d at 516–17 (holding that independent review of misconduct allegations can defeat a pretext claim based on subordinate bias).

Though Bell does not explicitly invoke a subordinate-bias theory of liability, the thrust of her argument takes aim at two non-decisionmakers: Berg and Powell. *See generally* Op. Br. (referencing Berg and Powell eighty-six times while mentioning Dellinger, the decisionmaker, four times). She does not use subordinate-bias metaphors like "rubber stamp" or "cat's paw," but her underlying theory seems to be that Berg and Powell used Dellinger as a tool to effect their biased designs. *Id.* at 5, 19, 26, 30 (alleging that Berg and Powell "started a campaign to tarnish" Bell's record, that Berg and Powell "were successful in padding [Bell's] file," and that Powell "conspired" to "sabotage"

30

Bell). For that theory, Bell needed to raise a genuine dispute of material fact on (1) whether the subordinates—Berg and Powell—had discriminatory or retaliatory animus, and (2) whether the "subordinate's animus translated into [biased] actions that caused the decisionmaker to take adverse employment action." *Thomas*, 803 F.3d at 515.

Assuming without deciding that Bell has raised a genuine dispute of material fact on the first showing—subordinate animus—we conclude that she fails to show that that animus motivated her termination. "It is well-established in this Circuit that an employer can break the causal chain between the biased subordinate's unlawful actions and the adverse employment action by independently investigating the allegations against the employee." *Id.* at 516 (internal quotation marks omitted).

The City provided Bell with a due-process hearing where she could present evidence and arguments to defend against the misconduct allegations brought against her. This was the overarching process: (1) Berg alleged that Bell had mistreated and lied about HR staff; (2) Bell received notice of those allegations and was given time to prepare a defense for a pretermination hearing; (3) after seeing the evidence, the third-party hearing officer found the allegations meritorious and recommended that Bell be fired for violating work policy; and (4) Dellinger received the hearing officer's recommendation and fired Bell.

31

Bell points to no competent evidence indicating that the hearing officer or the decisionmaker was biased, or that they "merely rubber-stamped" the misconduct allegations made by a subordinate.[13] *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 715 (10th Cir. 2014); *see Kendrick*, 220 F.3d at 1231 (finding no pretext, in part, because there was no evidence suggesting the decisionmakers "acted upon a discriminatory motive in their own right"). She also cites no evidence suggesting that the hearing officer "failed to adhere" to procedure, that the notice-and-hearing process itself was "flawed," or that the hearing was "a sham." *Thomas*, 803 F.3d at 517. And, as already discussed, she highlights nothing showing that the City singled her out for disciplinary hearings when others engaged in similar misconduct were not.

We find the City's independent investigation and review sufficient to break the causal chain of any animus that subordinate, non-decisionmakers

---

[13] Though not naming him as such, Bell suggests that Dellinger was a part of Powell and Berg's alleged "campaign to tarnish [her] stellar employment record . . . ." Op. Br. at 5. In support of Dellinger having an unlawful motive, Bell states that he started suspending her after she "filed grievances and complaints for disparate treatment" against him. *Id.* at 26. For that proposition, she cites the discrimination complaints about the bathroom and telework situations that she filed against Berg and Powell, not Dellinger. Bell also mentions that Dellinger declined the hearing officer's recommendation to reassign her to a different supervisor after her first suspension. But she fails to explain how that discretionary decision suggests that Dellinger had unlawful bias, especially when Dellinger later declined the hearing officer's first recommendation to terminate her. So even if she contends that Dellinger had unlawful bias himself, that assertion is not supported by adequate citations to the record, Fed. R. Civ. P. 56(e)(2), and it is inadequately briefed.

might have had for starting the disciplinary proceedings. *See Macon*, 743 F.3d at 711–12, 715 (explaining that although an allegedly biased subordinate started the process leading to the plaintiff's termination, the employer's unbiased review process "appropriately constrained any improper motive"). Whether Bell's discrimination and retaliation claims are based on decisionmaker or subordinate bias, no reasonable juror could find on this record that the City's legitimate reasons for terminating her were pretextual.

## CONCLUSION

We affirm.

Entered for the Court

Gregory A. Phillips
Circuit Judge